## KETCHUM & CO., Inc. v. STATE MUT. LIFE ASSUR. CO. OF WORCESTER, MASS.

### No. 258, Docket 20581.

Circuit Court of Appeals, Second Circuit.

July 23, 1947.

Isidor E. Schlesinger and Schlesinger & Krinsky, all of New York City (Robert E. Tinsley, of Malverne, N. Y., on the brief), for appellant.

Bruce Bromley, and Cravath, Swaine & Moore, all of New York City (Louis T. Stone, Jr., of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment, entered upon the verdict of a jury in an action to recover upon a policy of life insurance, taken out upon the life of one of its officers, named Tuffiash. The defense was that Tuffiash in his application for the policy had stated that he had not seen a physician for five years and that he did not suffer from any heart ailment, when in fact both statements were false; and that the insurer would not have issued the policy if it had known the truth. The evidence was that the application, which was made in March, 1944, contained the following questions, to which Tuffiash made the following answers:

"17. Are you in good health? A. Yes.

"18. Have you ever suffered from any ailment or disease of * * * (b) the heart, blood vessels or lungs? A. No."

"20. What physician or physicians, or clinic, if any, not named above have you consulted or been treated by, within the last five years, and for what illness or ailment? A. None."

In February, 1944, Tuffiash had consulted an orthopedic surgeon, named Kruger, who after examining him, sent him to a heart specialist, named Bernstein, because Kruger thought "that he should have a complete,

general medical check-up to see if there was any general condition that might explain his symptoms. I couldn't find it on an orthopedic basis." The chief symptom, which caused Kruger to send him to Bernstein, was that his hands swelled after they had hung down for a long time. Bernstein examined him and reported to Kruger that he found that "there was some sclerosis of the fundal blood vessels. That means in the eye grounds." The electrocardiogram showed "some suggestion of early coronary insufficiency"; but "no organic cardio vascular disease." Nevertheless "the cardiogram and the examination, especially the fact that he had some changes in the eye grounds, suggested a sclerosis. That helped me to decide that there may be some coronary insufficiency." The defendant then put on witnesses who swore that, had it known of Bernstein's report to Kruger, it would have rejected Tuffiash's application.

The Court left three questions to the jury:

"(1) Did the insured, Charles Tuffiash, consult Dr. Bernstein during the year prior to applying for the policy in suit?

"(2) If you find an affirmative answer to question No. 1, would the defendant have issued the policy in suit had it known of such examination, without receiving a report from Dr. Bernstein?

"(3) If you find the answer to question 1 in the affirmative, would the defendant have issued the policy in suit had it received a report from Dr. Bernstein on the history given to him by the insured, his examinations and findings?"

The jury answered the first question, "Yes."; the second and third questions, "No." Thereupon the judge directed a judgment for the defendant. The only question is whether the three answers of the jury were adequate under § 149 of the Insurance Law of the State of New York, Consol.Laws, c. 28.[1]

Until 1909 all answers made by an applicant for life insurance to questions put by the insured were in New York regarded as warranties and invalidated the policy, if they were false.[2] In that year however the legislature enacted § 58 of the Insurance Law which provided that in life insurance applications such answers should be treated as "representations," and not "warranties"; the purpose being not to invalidate policies unless the truth supressed was "material as an inducement for the issue of the policy, and was untrue." [3] In a series of later decisions the Court of Appeals decided that, although § 58 made the materiality of the misrepresentation depend upon whether the insurer would have refused the application, had it known the truth, as matter of law, the misrepresentation was always "material" if a physician had discovered that the applicant was suffering from any ailment, unless it was of an obviously trivial nature, like a cold in the head.[4] In the last two of these decisions two judges dissented, on the ground that whether the ailment which the physician discovered was "material" was never a question of law, but always for the jury, subject of course to the same control over the verdict that a court has over any other verdict.

The Insurance Law of 1939 was a general recasting of the earlier law of 1909; and the material formerly in § 58 was much expanded and distributed among §§ 142, 149 and 150. The dissenting opinion in Glickman v. New York Life Ins. Co., supra, 291 N.Y. 53, 50 N.E.2d 538, 148 A.L.R. 454,[5] says that §§ 149 and 150 were intended to "overcome" the earlier decisions, and in Giuliani v. Metropolitan Life Ins. Co.,[6] the Fourth Department quoted from the committee report a passage declaring that sub-

1 Chap. 882 of the Laws of 1939.

2 Rohrbach v. Germania Fire Insurance Co., 62 N.Y. 47, 20 Am.Rep. 451.

3 Eastern Dist. Piece Dye Works v. Travelers' Insurance Co., 234 N.Y. 441, 450, 138 N.E. 401, 403, 26 A.L.R. 1505.

4 Travelers' Insurance Co. v. Pomerantz, 246 N.Y. 63, 158 N.E. 21; Minsker v. John Hancock Mutual Life Ins. Co., 254 N.Y. 333, 173 N.E. 4, 81 A.L.R. 829; Jenkins v. John Hancock Mutual Life Ins. Co., 257 N.Y. 289, 178 N.E. 9; Anderson v. Ætna Life Ins. Co., 265 N.Y. 376, 193 N.E. 181; Geer v. Union Mutual Life Ins. Co., 273 N.Y. 261, 7 N.E.2d 125; Glickman v. New York Life Ins. Co., 291 N.Y. 45, 50 N.E.2d 538, 148 A.L.R. 454.

5 291 N.Y. 45, 52, 50 N.E.2d 538, 148 A.L.R. 454.

6 269 App.Div. 376, 56 N.Y.S.2d 475.

division two of § 149 was so intended. True that subdivision did not in words declare that the question of the "materiality" of a misrepresentation was always for the jury, but that was among other changes undoubtedly its effect. Subdivisions one and three we may disregard, and subdivision two merely incorporates the definition of materiality that the courts had themselves theretofore laid down. The case at bar turns therefore upon subdivision four, which, omitting the words not here applicable, reads as follows: "A misrepresentation that an applicant * * * has not had previous * * * consultation * * * shall be deemed, for the purpose of determining its materiality, a misrepresentation that the applicant has not had the disease, ailment or other medical impairment * * * which was discovered * * * as a result of such consultation * * *." The plaintiff insists that a literal reading of the words leads to the conclusion that, when an applicant falsely answers that he has not consulted a physician, his answer is to be taken to mean, not that the physician did not discover that he had the ailment which the physician did discover, but that the applicant did not in fact have that ailment. From this, the plaintiff says, it follows that an insurer to establish its defense must prove that the applicant did have that ailment. Before considering how far the language compels that construction, it is pertinent to consider its consequences. If the physician's discovery was "material" under subdivision two—that is, if the "facts misrepresented" "would have led to a refusal by the insurer"—an applicant who should disclose the results of the consultation would by hypothesis fail to get a policy. On the other hand the beneficiary of an applicant who had suppressed the discovery, and who had for that reason received a policy, would recover, unless the insurer succeeded in proving that the applicant did suffer from the ailment. It would not avail the insurer to prove that, had it known of the discovery, it would not have issued the policy. The fact that the ailment was discovered would have no relevancy; the issue would be the applicant's actual state of health. That might be extremely difficult, or impossible to prove, especially if the physician were no longer available at the trial. And even if he were available, it would be open to the beneficiary to disprove his testimony. It appears to us extremely improbable that the legislature intended to put applicants, who concealed their consultations with physicians, at such an advantage over those who disclosed them.

Coming next to the text. It is true that subdivision four declares that, when an applicant answers falsely that he has not consulted a physician, his answer is to be taken as though he had said that he had not had the ailment which the physician discovered. If the "facts misrepresented" were the test of "materiality," there might be some plausibility in the plaintiff's argument that the insurer would have to prove that the applicant had in fact had the ailment, and the applicant's suppression of the physician's discovery would be irrelevant, although the discovery itself might of course be in such form that it would be competent evidence on the issue. However, subdivision four does not unconditionally make the existence of the ailment the "fact misrepresented"; it makes it such only "for the purpose of determining its materiality; that is, the materiality of the misrepresentation. It is subdivision two which defines "materiality," and therefore this part of subdivision four means no more than that, in using the test of materiality set up by subdivision two, one must take the "facts misrepresented" as the existence of the ailment. The test of materiality in subdivision two is, however, not the existence of the "facts misrepresented," but "knowledge by the insurer of the facts misrepresented"; if that "knowledge * * * would have led to a refusal by the insurer," the "misrepresentation" (the denial of the consultation which pro hac vice becomes a denial of the existence of the ailment), is a good defense. Therefore, the question is whether a communication of the physician's discovery would have given the insurer "knowledge" of the ailment.

■ That such information falls within the meaning of "knowledge," as the section uses the word, does not seem to us open to debate. The Legislature was dealing with practical affairs, not epistemology, and any "knowledge" of the existence of a past ail-

ment is inevitably an inference, based upon information, or present clinical examination. It is not possible to imagine what other kind of "knowledge" of the ailment the insurer could acquire. True it might add to that examination, which it always makes of an applicant's existing state of health, an inquiry as to his past state of health; but that would only result in the same kind of "knowledge" that it would have got from the discovery of the applicant's physician. Moreover, if the plaintiff is right, that inquiry would not be conclusive, for the issue as to the existence of the ailment is always open at the trial; only the jury's "knowledge," as manifested in its verdict, is material. It seems to us incredible that the section means to expose insurers to such a chance whenever an applicant, however innocently, suppresses information which "would have led to a refusal by the insurer." It follows that the answers of the jury determined the only relevant issues.

Judgment affirmed.