**FLEET MESSENGER SERVICE, INC.,**
Appellant,

v.

**LIFE INSURANCE COMPANY OF
NORTH AMERICA,** Appellee.

No. 292, Docket 27800.

United States Court of Appeals
Second Circuit.

Argued March 21, 1963.

Decided April 4, 1963.

594

Jacob Imberman, New York City (David I. Goldblatt, Proskauer, Rose, Goetz & Mendelsohn, New York City, on the brief), for appellant.

Edward T. Post, New York City (Tanner, Friend, Kinnan & Post, New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and CLARK and MARSHALL, Circuit Judges.

LUMBARD, Chief Judge.

This is an appeal from a judgment for the defendant in the United States District Court for the Southern District of New York. Following a trial before a jury, which returned a verdict for the plaintiff, Judge Levet granted the defendant's motion for judgment notwithstanding the verdict and, in the alternative, granted the defendant's motion for a new trial. His opinion was filed on July 10, 1962. An order granting judgment for the defendant was filed on August 15, 1962. We affirm.

The plaintiff, Fleet Messenger Service, Inc., was the beneficiary of a "key-man" insurance policy issued on September 12, 1958, on the life of its president, Nicholas R. Chase,[1] by the defendant, Life Insurance Company of North America. Chase died on April 18, 1959. The plaintiff brought this action when the defendant refused to pay the amount of the policy, basing its refusal on the ground that the insured had made material misrepresentations concerning his health in the application for the policy.

The plaintiff applied for the policy on August 20, 1958. In one part of the application, the proposed insured, Chase, was required to give information about his health. In response to questions put to him by the defendant's examining physician, Chase denied that he had or had ever experienced "disease of heart, blood or blood vessels" or "coronary disease, chest pain or discomfort." He stated that he had had "operations; X-rays, electrocardiograms; hospitalization," expanding this answer by the following: "Annual checkup & E.c.g. X-rays & blood studies and Physical Exams. Dr. Paley 865 5th Ave. N. Y. C." He stated that he had not had "other illness or injury in the past 5 years" or "other examination or treatment by any physician or practitioner, hospital or institution within the past 5 years." He provided the name and address of his personal physician, Dr. Fallis.

The examining physician, Dr. Ritota was a specialist in internal medicine and heart disease. He made a thorough physical examination, including a cardiac examination, chest X-ray, and electrocardiogram. The examination results were normal. The defendant also sent form letters to Dr. Fallis and Dr. Paley, named by Chase in the application for insurance; the letters requested "a report from your records including any significant symptoms, positive findings on physical examination; the results of X-ray, laboratory or other diagnostic studies; your

1. The insured's real name was Nicholas R. Ciasca. The parties stipulated that the insured be referred to as Chase, a name used by him for business purposes.

diagnosis, any treatment and the response." The letter to Dr. Fallis requested also a summary of Chase's medical history. Both letters included an authorization from Chase. The reply of Dr. Fallis noted, in addition to references to a sore throat, a sprained ankle, and a vaccination, the following:

| "Dates of Consultations | Symptoms | Physical Findings, Laboratory Tests, X-ray, and Electro- cardiograms | Diagnosis | Treatment and Results |
|---|---|---|---|---|
| 3/20/56 | Vague chest & epigastric pains | Px negative EKG by another M. D. negative | No definite diagnosis made | Improved |
| * * | * * | * * | * * | * * |
| 11/29/57 | Received report from Dr. David H. Paley N. Y. C. 21. Suggest you refer to him for lab work & EKG and complete Px he performed." | | | |

———◆———

Dr. Paley's reply stated: "Mr. Ciasca [Chase] presented himself for routine physical examination. He was last seen on May 8, 1958, at which time I found him in excellent condition. A chest film was negative and ECG, a copy of which is enclosed * * *, showed no significant abnormalities." Doctors on the defendant's medical staff made reports on the electrocardiogram taken by Dr. Paley and the electrocardiogram and X-ray taken by Dr. Ritota.

On the basis of all this information, on September 12, 1958, the defendant issued a life insurance policy in the amount of $100,000. Seven months later Chase was dead. An autopsy showed the cause of death to be "advanced occlusive coronary atherosclerosis with myocardial fibrosis." The defendant investigated further and turned up the following information. The office records of Dr. Fallis indicated that Chase had had an "anginal syndrome" on March 20, 1956, and that Dr. Fallis had noted "cardio-evidence coronary sclerosis." On November 29, 1957, Dr. Paley wrote a letter to Dr. Fallis, at Chase's suggestion, which said among other things that Chase had come to see him on August 30, 1957, for a general checkup and that Chase's complaints were "rather characteristic of an angina of effort" and that Dr. Paley thought Chase "had arterio-sclerotic heart disease and anginal syndrome."

Dr. Fallis was not available at the trial, having predeceased Chase. Dr. Paley testified that when Chase first came to him on August 30, 1957, Chase said that he had had a checkup about a year before and had been advised of a heart strain and an elevation of his cholesterol. He complained of chest pain on effort over the previous three or four years. As Dr. Paley later reported to Dr. Fallis, he made a tentative diagnosis, based largely on the history of chest pain, of arterio-sclerotic heart disease and anginal syndrome. He prescribed nitroglycerine, which dilates the blood vessels, and cautioned Chase to avoid overexertion and excitement and to take various hygienic measures. Dr. Paley testified that he had explained Chase's condition to him, using lay terminology. Dr. Paley saw Chase again on May 8, 1958, at which time the same symptoms were noted and the same diagnosis made. On another visit, after the insurance policy had been issued, the diagnosis was unchanged.

Another witness at the trial was Dr. Shankman, who treated Chase on May 6,

1958, for bursitis. Before prescribing treatment, Dr. Shankman asked Chase for his medical history. On the basis of Chase's remarks, Dr. Shankman noted on his records that Chase had "known angina pectoris." Dr. Shankman testified, in effect, that he did not recall precisely what Chase had told him but that he would not have recorded "known angina pectoris" unless Chase had mentioned chest pains and relieving them with nitroglycerine.

■ It is clear from the above that Chase misrepresented his physical condition and medical history in the application for insurance. Contrary to his answers, he had, or had experienced, "disease of heart, blood or blood vessels"; he had experienced chest pain; he had been treated, not merely given a checkup, by Dr. Paley; and he had been treated by Dr. Shankman.

The substantive questions presented on this appeal are (1) whether, under the applicable law, Chase's misrepresentations avoid the defendant's liability on the insurance policy; and (2) if so, whether the defendant had notice of the misrepresentations such that a defense based on them was waived.

■■ In conformity with a pre-trial order, consented to by the parties, Judge Levet made a pre-trial determination that New York law controlled. We agree. A federal district court sitting in New York must use the choice-of-law rules of New York to determine the law which is applicable in an action grounded on state law. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954), New York adopted the "center of gravity" or "grouping of contacts" approach for choice-of-law problems in contract situations having elements connected with more than one jurisdiction. Under that approach, the governing law is that of the jurisdiction "which has the most significant contacts with the matter in dispute". Id. at 160, 124 N.E.2d at 102; Rubin v. Irving Trust Co., 305 N.Y. 288, 305, 113 N.E.2d 424 (1953). The plaintiff questions the applicability of Auten to insurance contracts, relying on New Amsterdam Casualty Co. v. Stecker, 3 N.Y.2d 1, 163 N.Y.S.2d 626, 143 N.E.2d 357 (1957), in which ambiguous language of the New York Court of Appeals might be construed to indicate a withdrawal from the Auten rationale. But Auten is cited as authority for the decision in New Amsterdam, 3 N.Y.2d at 5, 163 N.Y.S.2d at 628, 143 N.E.2d at 358, and as we have stated in another case, Zogg v. Penn Mutual Life Ins. Co., 276 F.2d 861, 864 n. 6 (2 Cir., 1960), we do not understand New Amsterdam to be a departure from the rule laid down in Auten.

■ Applying the "center of gravity" test, we believe that New York is the state having the most significant contacts with this controversy. Both the beneficiary and the insured were New York residents. Opposed to this are the facts that the insurer is a Pennsylvania corporation, not licensed to do business in New York; that the policy was issued, thereby becoming effective, at the insurer's home office in Pennsylvania; and that the policy's provisions for notice to the insurer by the insured required that notice be given at the Pennsylvania home office. There were also some contacts with New Jersey; the application for the policy was executed in that state, and the first premium was tendered to one of the defendant's representatives there. The New Jersey contacts are fortuitous, and no one contends that the law of that state should control. But for the fact that the defendant was not licensed to do business in New York, the events occurring in New Jersey would almost certainly have taken place in New York.

The situation, then, is that the beneficiary's and insured's sides of the transaction are connected with New York, and the insurer's side with Pennsylvania. We think a New York court would apply New York law. Compare Strubbe v. Sonnenschein, 299 F.2d 185 (2 Cir., 1962). If we can presume that in a case where the contacts are so nearly evenly balanced in

number and "nature," a New York court would look also to the substantive impact of the contending laws, such a test further supports the application of New York law. The issues to be resolved in this case concern the effect of an insured's misrepresentations on the beneficiary's right to recover.[2] New York law is harder on beneficiaries in this respect than the law of Pennsylvania, and it is the out-of-state insurer who relies on New York law. There is no problem of local law being applied to the disadvantage of the party from out of state. New York having fashioned a "hard" rule regarding the effect of an insured's misrepresentations on the beneficiary's right to recover, it is difficult to see why, in a controversy with an out-of-state insurer over a policy issued on the life of a New York insured, the New York beneficiary should not be held to the same law which would apply if the insurer were not from out of state.

Under New York Insurance Law, McKinney's Consol.Laws, c. 28, § 149(2) a material misrepresentation avoids an insurance contract.[3] Section 149(4) provides that, for purposes of determining materiality, a misrepresentation that an applicant for life insurance "has not had previous medical treatment, consultation or observation" shall be deemed a misrepresentation that the applicant "has not had the disease, ailment or other medical impairment for which such treatment or care was given or which was discovered by any licensed medical practitioner as a result of such consultation or observation".[4] There is no dispute that, if by § 149(4) the insured is deemed to have had the disease for which he was treated, that fact is material under the standard of materiality contained in § 149(2).[5] Chase's misrepresentations are unquestionably covered by § 149(4); unless waived, therefore, they constitute a defense in an action to recover on the policy.[6]

The sole question remaining is whether the insurer had such knowledge of the misrepresentations before it issued the policy that it should be held to have waived the defense. We agree with Judge Levet that the evidence does not permit the inference that the insurer had this knowledge. At the time the policy was issued, the insurer knew that Chase had answered falsely the question whether he had ever experienced chest pains. But Dr. Fallis' report, which gave the insurer this information, characterized Chase's

2. In particular, the laws of the two states differ as to the effect of innocent misrepresentations by the insured. The New York law is discussed in note 6 below. For a statement of Pennsylvania law, which is that innocent misrepresentations do not avoid the insurer's liability on an insurance policy, see Levin v. Metropolitan Life Ins. Co., 381 Pa. 615, 114 A. 2d 330 (1955); Travellers Ins. Co. v. Heppenstall Co., 360 Pa. 433, 61 A.2d 809 (1948). The parties do not contend that the choice of law is relevant to any other issue in the case.

3. Section 149(2) provides:
"No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract."

4. Section 149(4) provides, in relevant part:

"A misrepresentation that an applicant for life, accident or health insurance has not had previous medical treatment, consultation or observation or has not had previous treatment or care in a hospital or other like institution, shall be deemed, for the purpose of determining its materiality, a misrepresentation that the applicant has not had the disease, ailment or other medical impairment for which such treatment or care was given or which was discovered by any licensed medical practitioner as a result of such consultation or observation."

5. See note 3 supra.

6. Judge Levet found, and we agree, that Chase knew his representations to be false. But the misrepresentations would constitute a defense even if innocently made. Tolar v. Metropolitan Life Ins. Co., 297 N.Y. 441, 80 N.E.2d 53 (1948); Geer v. Union Mutual Life Ins. Co., 273 N.Y. 261, 265, 7 N.E.2d 125 (1937); see Ketchum & Co. v. State Mut. Life Assur. Co., 162 F.2d 977 (2 Cir., 1947).

ailment as "vague chest and epigastric pains," not in itself ground to reject the application for insurance. Both Dr. Fallis' and Dr. Paley's reports gave the defendant positive assurance that Chase had no condition which made him uninsurable. Albeit knowing that Chase had misrepresented a seemingly unimportant fact, the defendant had received, so far as it knew, complete reports from all the doctors who had treated Chase; it had no reason to suspect that there was anything more serious which was unrevealed. In addition, the defendant had the affirmative results of a thorough physical examination performed by Dr. Ritota.

The defendant might have inquired of Chase why he had denied having had chest pains; but with the doctors' reports before it, it was not unreasonable not to make such inquiry. And even if the defendant was negligent in some degree, this does not constitute notice. In a very similar case the New York courts reversed a jury verdict for the beneficiary and directed that the complaint be dismissed. Cherkes v. Postal Life Ins. Co., 285 App.Div. 514, 138 N.Y. S.2d 788 (1955), aff'd without opinion, 309 N.Y. 964, 132 N.E.2d 328 (1956). Presiding Justice Peck there said:

"Defendant's negligence in not making further inquiry may be conceded, but that is not the equivalent of knowledge, nor does it cancel out or counteract the insured's fraud. Knowledge that the insured was not a favorable risk did not cast the burden upon defendant of looking suspiciously and searchingly beyond the facts disclosed for undisclosed ailments * * *. The test is not one of what prudent inquiry would have revealed. The question is whether the information given, although partial, was sufficiently indicative of something more to be tantamount to notice of the unrevealed."

285 App.Div. at 516, 138 N.Y.S.2d at 790. See Zeldman v. Mutual Life Ins. Co., 269 App.Div. 53, 53 N.Y.S.2d 792 (1945).

Although a jury verdict is not lightly to be overturned, we agree with Judge Levet that the evidence adduced at trial does not permit the inferences necessary to establish the plaintiff's case. That being so, it was proper to grant the defendant's motion for judgment notwithstanding the verdict. See Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940). See also Federal Rules of Civil Procedure 50(b)–(d), as amended, adopted by the Supreme Court on January 21, 1963, and Advisory Committee's Note to Rule 50(b)–(d), in Report of the Judicial Conference of the United States on Proposed Amendments to the Rules, submitted on September 21, 1962.

Judgment affirmed.