**FRUTICO, S.A. de C.V., Itex, Inc. and Grupo Reynosa, S.A., Plaintiffs,**

v.

**BANKERS TRUST COMPANY and Bankers Trust New York, Defendants.**

No. 91 Civ. 7262 (RWS).

United States District Court, S.D. New York.

Sept. 13, 1993.

---

Cardenas, Whitis, Stephen, Corcoran & McLain, McAllen, TX (J. Scott McLain, of counsel), Coleman & Rhine, New York City (Joseph E. Gasperetti, of counsel), Munoz, Hockema & Reed, McAllen, TX (Roger Reed, John L. Tippitt, III, of counsel), for plaintiffs.

Dorsey & Whitney, New York City (Richard L. Bond, Stewart D. Aaron, of counsel), Bankers Trust Co., New York City (Jack H. Weiner, of counsel), Atlas & Hall, McAllen, TX (Gary Gurwitz, Frederick J. Biel, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants Bankers Trust Company ("BTCo") and Bankers Trust New York ("BTNY") (collectively, "Bankers Trust") have moved pursuant to Rule 56, Fed.R.Civ. P., for an order granting summary judgment in their favor and against the plaintiffs Frutico, S.A. de C.V. ("Frutico"), Itex, Inc. ("Itex"), and Grupo Reynosa, S.A. ("Grupo"), dismissing the latter's complaint in its entirety.

For the reasons set forth below, Bankers Trust's motion is granted.

### Parties

Frutico and Grupo are corporations organized and existing under the laws of Mexico. Itex is a corporation organized and existing under the laws of the State of Texas with its principal place of business in Hidalgo County, Texas. At all times materially relevant to this action, Frutico was the majority shareholder in Itex, and Grupo was a major shareholder in Frutico.

BTCo and BTNY are corporations organized and existing under the laws of the State of New York and doing business in the State of Texas. BTCo is a subsidiary of BTNY.

### Prior Proceedings

This diversity action was commenced in Texas state court in December 1990. It then was removed to the United States District Court for the Southern District of Texas and subsequently was transferred to this Court on October 10, 1991. This Court granted the Plaintiffs leave to amend the original complaint, and an amended complaint (the "Amended Complaint") was filed on February 10, 1992.

By Stipulation and Order, entered by this Court on January 18, 1993, the pretrial discovery period ended on February 15, 1993. Bankers Trust now moves for summary judgment on the ground that discovery has established that no genuine issues of material fact exist which can prevent it from obtaining a judgment as a matter of law on each claim set forth in the Plaintiffs' Amended Complaint.

Bankers Trust filed this motion on March 4, 1993. Oral argument was heard on June 2, 1993, and the motion was considered submitted as of that date.

### Facts

The gravamen of this action is the purported breach of an alleged agreement (the "Alleged Agreement") in which Bankers Trust was to make $2,265,000 available to Frutico in the form of either a loan or an investment.

At all times materially relevant to this action, Frutico operated a fruit juice processing business in Reynosa, Mexico and was the majority shareholder in Itex. Grupo was a major shareholder in Frutico and owned the land on which Frutico's plant was located. Itex sold products produced by Frutico in Mexico to purchasers in the United States and elsewhere.

### I. Initial Negotiations

The negotiations with Bankers Trust were conducted for Frutico by Garrison Valentine ("Valentine"), the de facto principal of Fruti-

co, Grupo, and Itex.[1] During the period from January through November 1988, Valentine and Bankers Trust discussed various transactions that were to involve Interfruit Holdings, Inc. ("Interfruit Holdings") as the investment vehicle and/or borrower. Interfruit Holdings had been formed in the Cayman Islands for the purpose of holding shares of a new Mexican corporation that was going to buy the assets of Frutico.

BTCo had made loans to the Mexican Government and to related entities that had gone unpaid. During 1986 and 1987, the Mexican Government instituted a variety of programs through which public sector debt could be converted into investments in privately owned companies in Mexico. In late 1986, BTCo began conducting discussions with Valentine regarding a potential investment in Frutico through a "debt-for-equity" program sponsored by the Mexican Government. Frutico alleges that Bankers Trust initially agreed to finance the expansion of Frutico and another Valentine company, Frutindustrias de Mexicali ("Frumex"), with $4,200,000 in late 1987. This transaction was contingent on the Mexican Government's debt-for-equity program, and when that program was subsequently terminated so too was the proposed transaction involving the full amount of $4,200,000. According to Valentine, at that time, the proposed transactions were "changed by circumstances beyond the bank's and our control." Valentine Dep. at 306.

## II. The Alleged Agreement

After the debt-for-equity swap program was suspended by the Mexican Government, discussions continued between Valentine and Bankers Trust regarding a possible term loan or investment transaction. The Plaintiffs contend that the Alleged Agreement became binding in early 1988 and resulted from a continuing commitment by Bankers Trust to Frutico which had its origin in a meeting between Valentine and Bankers Trust at that time. However, although Frutico contends that the Alleged Agreement

was entered into at that time, Valentine acknowledges that it had not been determined whether the transaction was to take the form of a loan or an investment.

In light of the "changed circumstances" the terms and conditions of the Alleged Agreement went through several transformations, including alterations of the assets of Valentine's companies that were to be included in the proposed transactions. Originally, the assets of both Frutico and Frumex were to be included, but Valentine then removed Frumex from the proposal, and Bankers Trust correspondingly reduced its proposed commitment from $4,200,000 to $3,500,000.

## III. The Short–Term Loans

During the course of the continuing discussions begun in 1987, BTCo made three loans (the "Short–Term Loans"), which Frutico characterizes as "bridge loans" and Bankers Trust characterizes as "short-term extensions of credit," to Frutico. Under the terms and conditions of the Short–Term Loans, Frutico incurred the following obligations to BTCo: $270,000 pursuant to drawings made against a letter of credit issued by Bankers Trust in August 1988; $700,000 pursuant to a loan agreement executed in November 1988; and $200,000 pursuant to a loan agreement executed in January 1989. Frutico further asserts that Bankers Trust agreed that the Short–Term Loans were to be used to finance equipment purchases until a reorganization agreement was drawn up.

## IV. The Continually Evolving Terms Of The Alleged Agreement

Frutico alleges that in June 1988 the amount of funding under the Alleged Agreement was reduced to $2,350,000 because of changes in an equipment order. This amount was to be spent on machinery and equipment and infrastructure at Frutico to accommodate the new equipment. Frutico reduced the amount further to $2,200,000 upon realizing that it had calculated into the

---

1. Although Valentine was not denominated as either a director or officer of these corporations during the relevant time period, his minor children owned more than 90% of Grupo's outstand-

ing shares. The remaining shares were held by key Frutico officers, Raul DiBella and Octavio Gonzalez de Aragon.

transaction an unnecessary piece of equipment.

Despite asserting that the Alleged Agreement was binding as of early 1988, Valentine admitted that he "didn't feel absolutely confident that the bank and I had a total commitment until they made the first bridge loan," to wit, the letter of credit transaction of August 3, 1988. Valentine Dep. at 301; *accord id.* at 281. Furthermore, the structure of the offshore holding company, the establishment of the product invoicing and collection systems, and the terms of collateral to protect Bankers Trust were not agreed upon until December 1988.

Frutico also asserts that under the terms and conditions of the Alleged Agreement, Bankers Trust was to have an option to convert its debt into a joint venture, with Bankers Trust receiving 19.9% ownership in Frutico. However, Valentine admitted that Bankers Trust never was a partner of any of the Plaintiffs.

### V. *Similar Financing Sought By Frutico From Mexican Banks*

Although Valentine testified that throughout 1988 he relied upon the Alleged Agreement with Bankers Trust to finance Frutico's expansion and renovation and made economic commitments based upon Bankers Trust's representations that it would furnish the funding, contemporaneous documents and the testimony of Raul DiBella ("DiBella"), Frutico's Director General and minority shareholder in Grupo, reveal that on July 11, 1988, a Frutico executive was authorized by the corporation to seek a line of credit for US $2,469,520 from Banco Nacional de Commercio Exterior in Monterrey, Mexico to purchase new equipment manufactured in the United States.

DiBella made a similar effort on September 29, 1988 to borrow money from Banca Serfin in Reynosa, Mexico to purchase new equipment and expand Frutico's plant. DiBella sought a total of US $2,506,794 for new equipment and construction, and among the equipment listed to be financed by Banca Serfin were several items that were included in the Alleged Agreement with Bankers Trust.

### VI. *Various Reorganization Proposals*

The Alleged Agreement was complicated. The transactions underlying it involved reorganization agreements that were modelled on an offshore tax-advantaged structure initially agreed to by Frutico and ConAgra, Inc. ("ConAgra") in 1985. However, despite that previous model, the Bankers Trust documents were much more complex than ConAgra's in terms of the offshore structure which involved the Bahamas, the Cayman Islands, the Channel Islands, Mexico, and the United States. Given this complexity, the drafts of the reorganization agreement changed substantially over the course of the discussions between Frutico and Bankers Trust.

The two reorganization agreement drafts which circulated between January 21 and May 31, 1988 provided that Bankers Trust would invest in Interfruit Holdings, a Cayman Islands corporation. A third reorganization draft circulated in June 1988 provided that Bankers Trust would invest in Interfruit Holdings by transferring a portion of its Mexican public debt to The Valentine Group, a Cayman islands corporation. None of the three reorganization agreement drafts provided for a loan to or investment in Frutico or either of the other Plaintiffs. The Plaintiffs had no role in the proposed transactions other than a requirement to transfer Frutico and Grupo's respective assets to newly formed Mexican corporations or trusts.

In late November and December 1988 additional reorganization agreement drafts were circulated. None of these drafts provided that any money was to be loaned by Bankers Trust to any of the Plaintiffs. Rather, these drafts provided that BTNY was to invest in or lend funds to Interfruit Holdings or to Interfruit Industries, Ltd. ("Interfruit Industries"), which was proposed to be a Channel Islands corporation. The latter drafts provided that Interfruit Holdings or Interfruit Industries would be the borrowing entity and, through a capital injection, would become the majority owner of Frutico.

The last reorganization agreement draft dated December 22, 1988 (the "December 22

Draft") identified the yet-to-be-formed Interfruit Industries as that borrowing entity and future majority owner of Frutico. Therefore, up to the time that the negotiations between Bankers Trust and Frutico were terminated and Bankers Trust purportedly breached the Alleged Agreement, the party with whom Bankers Trust was to engage in the actual financial transaction and advance $2,265,000 was Interfruit Industries, the unformed off-shore holding company which was to be incorporated in the Channel Islands.

## VII. *The Unenforceability Of The Drafts*

During the course of discussions between BTCo and Valentine, numerous drafts of documents reflecting the proposed transactions were circulated among the parties. These drafts explicitly required the execution of written agreements before there would be any enforceable agreement among the parties. Specifically, each draft stated that it was a condition precedent to the consummation of the transaction contemplated by the proposed agreement set forth in the draft that the parties execute and deliver the agreement prior to its becoming effective. Each draft also provided that "This Agreement shall become effective when signed by all parties hereto...." Bond Aff.Exs. T & U. Neither the Plaintiffs nor their counsel objected to this language in the drafts which conditioned the enforceability of any agreements on the execution and delivery by all of the parties.

On November 30 and December 1, 1988, meetings were held in New York with Valentine and Bankers Trust regarding the Alleged Agreement. The Plaintiffs allege that it was at that time that the loan amount of $2,265,000 was agreed upon and all of the remaining details of the proposed transaction were resolved. However, following that meeting, Valentine wrote to BTCo's Peter Miller, thanking him for the attention and hospitality "during my visit with you and the BT team in New York last week," and stated:

From our point of view the sessions were the most productive in our long history of negotiations, and, as of this date, it ap-

pears to us that *we are very close to a commitment.*

\* \* \* \* \* \*

*Under the assumption that the Frutico project will be going forward,* we would like to address the issue of our Tampico project.

Bond Aff.Ex. DD (emphasis added).

Frutico's counsel received a letter dated December 14, 1988 from Banker Trust's counsel which included selected pages of the most recent draft "Note and Reorganization Agreement" and contained the condition that "This Agreement shall become effective when signed by all parties hereto...." Bond Aff. Ex.H. Frutico's counsel and Valentine discussed this draft with Bankers Trust's counsel in a conference call on December 15, 1988, and once again, no objection was made to the condition that Bankers Trust would not be bound until the written agreement was executed.

## VIII. *Open Terms In The December 22 Draft The Alleged Agreement*

While the Plaintiffs characterize the unresolved terms and conditions in the drafts of the Alleged Agreement as "minor details," Valentine Dep. at 275, it is undisputed that key provisions and required supporting documents were missing from the December 22 Draft—the draft which was circulated on or about December 22, 1988 and which Valentine identified as the draft embodying the terms and conditions of the Alleged Agreement to which Bankers Trust was bound.

Examples of missing terms and documents in the December 22 Draft include the following: Section One, ¶ 1.2(c) provided that "Interfruit [Industries] shall contribute U.S. $_____ to Frutico as a capital contribution in exchange for ____ shares of Frutico common stock." Bond Aff.Ex. U at 000922. The amounts were never filled in by the parties.

Similarly, Section One, ¶ 1.2(d) provided that:

From the capital contribution received from Interfruit [Industries], Frutico will (i) repay in full ... the Frutico Loan extended by BTCo pursuant to the Loan Agree-

ment, (ii) repay in full ... the Frutico Letter of Credit, (iii) apply U.S. $_____ for the purchase of fixed assets identified in Schedule 1 hereto and (iv) apply the remaining proceeds, if any, for working capital surplus;

*Id.* In addition to the amount being left blank, no schedule was attached to any of the draft documents, including the December 22 Draft. Therefore, missing from the December 22 Draft was both Schedule 1, which was to identify the fixed assets that Frutico was to purchase and define the final amount in terms of the use of the proceeds, and Schedule 3, which was to set forth the list of required governmental and regulatory approvals for the multinational transactions.

In Section One, ¶ 1.5(c) and (d) of the December 22 Draft required the identification of acceptable foreign counsel who were to provide opinions regarding the legality and enforceability of the proposed transactions in Mexico and the Bahamas, and those opinions were to be attached as Exhibits E and G to the Alleged Agreement. These counsel were never identified and neither the opinions nor the substance thereof was ever provided.

Thus, according to the December 22 Draft, the portion of Bankers Trust's alleged commitment to advance $2,265,000, which was to be transferred from the unformed offshore holding company, Interfruit Industries, to Frutico was not specified. Additionally, the draft documents omitted the portion of the contribution to Frutico's capital which had to be used to purchase fixed assets; the specifications regarding the machinery and equipment to be acquired with the monies; regulatory clearances required to close; the names of acceptable foreign counsel upon whose opinions the parties were willing to rely; and the substance of those opinions.

## IX. *Banker Trust's Decision Not To Proceed*

The Plaintiffs attribute Banker Trust's decision not to proceed to a general policy of not continuing loans to Latin America in light of the Brady Plan and other noneconomic considerations. Contrariwise, Bankers Trust asserts that its decision was purely economic in nature: In January 1989 it decided not to proceed with further negotiations because Frutico was underperforming and not meeting financial projections as a result of a combination of the high price and short supply of fruit, and Bankers Trust learned that Frutico was not in operation during its peak season.

## *Discussion*

### I. *New York State Law Is Controlling*

#### A. *New York's Choice–Of–Law Rules*

 As a preliminary matter, it must be determined which law to apply in interpreting the enforceability of the Alleged Agreement. In diversity actions, federal courts must apply the substantive law of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Under New York's choice-of-law rules, a court must apply the law of the jurisdiction "which has the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954); *accord Fleet Messenger Serv., Inc. v. Life Ins. Co.*, 315 F.2d 593, 596 (2d Cir.1963); *Philips Consumer Elec. Co. v. Arrow Carrier Corp.*, 785 F.Supp. 436, 442 (S.D.N.Y.1992).

 Thus, in an action sounding in contract, a court must look to the law of that state having the most "substantial relationship" or "significant contacts" with the parties and the contract to determine whether to enforce a choice-of-law clause agreed to by the parties. *See A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381, 165 N.Y.S.2d 475, 485, 144 N.E.2d 371, 381 (1957); *accord Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir.1987); *Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 758 (S.D.N.Y.1990).

 An exception to this rule arises when the action before the court has been transferred from another forum. In that situation, the transferee court must apply the choice-of-law rules of the transferor forum. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964); *Don King*, 742 F.Supp. at 756 n. 15.

■ Similarly, with respect to actions sounding in tort, a court in New York must apply the substantive tort law of the state with the "most significant relationship" with the occurrences giving rise to the cause of action and the parties. *See Babcock v. Jackson,* 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *accord American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988).

### B. Applying The Choice–Of–Law Rules

■ This action was transferred to this Court from the Southern District of Texas. Thus, as an exception to the usual practice of employing the choice-of-law rules of the local forum, the threshold issue is which law a similarly situated district court in the Southern District of Texas sitting in diversity would apply to this action. Texas courts, like those in New York, employ the "substantial relationship" or "significant contacts" test in deciding choice-of-law questions, *see Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984), and, therefore, that Southern District of Texas court would apply the same substantive law as would a similarly situated court in the Southern District of New York.

■ When the substantial relationship test is applied to the facts at hand, the substantive law of the State of New York is controlling. The parties intended that New York law would govern the transactions covered by the Alleged Agreement. The December 22 Draft explicitly states: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its law governing the conflict of laws." Bond Aff.Ex.U at 000946. Moreover, the agreements underlying the three Short–Term Loans specified that New York law governed the agreements and notes.

The Plaintiffs are located in Texas and Mexico, and Valentine, who controls all three, maintained residences at relevant times in California, Colorado, and Mexico. The Defendants are incorporated in New York. The negotiations surrounding the Alleged Agreement took place in New York, with Valentine travelling to New York City at lease twice to discuss the proposed transactions. Furthermore, the Short–Term Loans were repaid in New York, and the payments to the Defendants required by the Alleged Agreement were to be made in New York as well.

Finally, the Defendants allegedly tortious acts of commission and omission with regard to the negotiations, the terms and conditions of the Alleged Agreement, and the Defendants' purported breach of the Alleged Agreement are asserted to have taken place in New York.

Therefore, the State of New York has the most significant relationship with the parties and the transactions at issue, and the substantive law of this State is controlling.

### II. Bankers Trust's Motion For Summary Judgment Is Granted

### A. The Standard For Summary Judgment

■ The Rule 56 motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Rule 1, namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991).

The Second Circuit has unambiguously defined the role of the district court in deciding Rule 56 motions:

The district court's role ... requires the court not to resolve disputed issues of fact itself, but rather to see if there are issues of fact to be resolved by the factfinder at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). That is to say, when examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution. In mak-

ing its assessment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam).

*Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 n. 2 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

■■■■ When a motion for summary judgment is made and the nonmoving party will bear the burden of proof at trial, "Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). However, if the moving party is still entitled to judgment as a matter of law after all the facts alleged by the nonmoving party are resolved in his favor as true, then any remaining factual disputes are neither "genuine" nor "material" and will not prevent the court from granting the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("a material fact is 'genu-

ine' ... if the evidence is such that a reasonably jury could return a verdict for the nonmoving party"). Thus, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Finally, the court must look to the substantive law to determine which facts are "material," to wit, disputed facts that might affect the outcome of the suit under governing law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. It follows, then, that "[e]ntry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir. 1991).

**B. *The Defendants Are Entitled To Summary Judgment On Each Cause Of Action Raised By The Plaintiffs***

### 1. *Breach Of Contract*

■■■■ The Plaintiffs' first cause of action is a breach of contract claim based on the allegation that either "[t]he various letter, drafts of loan documents and other writings exchanged between the parties constituted a written commitment to loan funds which was breached by Defendants," or that the Defendants breached an oral commitment to loan the funds to the Plaintiffs. Am.Compl. at ¶ 26.

■■■■ "It is an elemental principle of contract law that no contract can be formed unless the parties intend to be bound," *Ogden Martin Sys. of Tulsa, Inc. v. Tri–Continental Leasing Corp.,* 734 F.Supp. 1057, 1066 (S.D.N.Y.1990), and under New York law, when parties to a proposed agreement "do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs," *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984); *accord Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985).

Among the various facts to be considered in determining whether negotiations have

ripened into an enforceable intent to be bound are the following:

(1) Whether the parties expressed to one another that they would be bound only by a written agreement; (2) whether there has been partial performance of the contract and that partial performance has been accepted; (3) whether all of the terms have been agreed upon and there is nothing left to negotiate; and (4) whether the agreement is the sort that is usually written.

*Shearson Lehman CMO, Inc. v. TFC Banking & Savings, F.A.,* 710 F.Supp. 67, 70 (S.D.N.Y.1989) (citations omitted); *accord Ogden Martin,* 734 F.Supp. at 1067.

On the record of the present motion, it is concluded that the parties did not intend to be bound to an enforceable agreement prior to execution and delivery of the documents by them. This condition precedent was expressly set forth in the draft agreements for the various proposed transactions, including the December 22 Draft, *see Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257 (2d Cir.) (conditions similar to those set forth here held to be controlling on the issue of the parties' intent to be bound), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *R.G. Group,* 751 F.2d at 76–77 (same), and Valentine acknowledged as late as December 8, 1988 that a commitment was still forthcoming.

██ The Short–Term Loans made by Bankers Trust to Frutico did not constitute part performance of the Alleged Agreement. The agreements underlying these loans establish that they were independent transactions that did not give rise to Bankers Trust intending to be bound with respect to the Alleged Agreement. They do not meet the threshold condition of having been "unequivocally referable" to the Alleged Agreement to justify a finding that Bankers Trust intended to be bound by that agreement. *See Anostario v. Vicinanzo,* 59 N.Y.2d 662, 463 N.Y.S.2d 409, 410, 450 N.E.2d 215, 216 (1983); *accord Jim Bouton Corp. v. Wm. Wrigley Jr. Co.,* 902 F.2d 1074, 1081 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

The Short–Term Loans were due to be paid not later than March 31 or June 30, 1989, well before the repayment date of the Alleged Agreement. Their only reference to the Alleged Agreement was a provision for earlier repayment in the event that the Alleged Agreement were closed. However, because the Alleged Agreement was referred to only as a contingent event, those references are insufficient to make the Short–Term Loans "unequivocally referable" the Alleged Agreement. *Cf. McErlean v. Union Nat'l Bank of Chicago,* 90 Ill.App.3d 1141, 46 Ill. Dec. 406, 412, 414 N.E.2d 128, 134 (App.Ct. 1980) (advance by bank held not to constitute partial performance of an agreement to lend additional funds).

██ Furthermore, the Plaintiffs' conduct in expanding Frutico's processing plant and purchasing equipment in anticipation of receiving funds from Bankers Trust cannot be construed as partial performance for the purpose of triggering the Alleged Agreement's enforceability. Partial performance requires one party to confer something of value on the other party, *see R.G. Group,* 751 F.2d at 75; *Shearson Lehman CMO,* 710 F.Supp. at 71, and Frutico's expenditures and commitments for its own expansion failed to confer any benefit on Bankers Trust. Finally, even if there had been considerable partial performance, summary judgment would be appropriate given the absence of any intent on Bankers Trust's part to be bound. *See Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989); *Ogden Martin,* 734 F.Supp. at 1070.

The existence of the various open terms and missing supporting documents in the final December 22 Draft indicates that the parties did not intend to be bound absent a written agreement. But even if those missing terms were agreed upon orally by the parties, a conclusion of fact not supported by the present record, New York law would refuse to recognize that Bankers Trust intended to be bound prior to the execution of the documents. *See R.G. Group,* 751 F.2d at 74.

Given the complexities of the proposed transactions and the significant sums of mon-

ey they were to involve, the Alleged Agreement was one to which its parties would not intend to be bound until all the relevant documents had been properly executed. *See Reprosystem*, 727 F.2d at 262–63. This finding also is supported by the prior dealings between Frutico and Bankers Trust involving the three Short–Term Loans, each of which was an executed written agreement.

In light of these factual considerations and New York's policy of avoiding the recognition of oral contracts involving "substantial and complex dealings," *id.* at 75, it is held that the intentions of the parties to the Alleged Agreement had not ripened to the point where they intended to be bound by any draft agreement, including the final unexecuted December 22 Draft of the Alleged Agreement, and that the Alleged Agreement is not a enforceable contract which Bankers Trust could have breached by its failure to loan Frutico $2,265,000. Therefore, Bankers Trust is entitled to summary judgment on the Plaintiffs' breach of contract claim.

### 2. *Promissory Estoppel*

■ The Plaintiffs assert a promissory estoppel claim on the ground that "Frutico substantially and reasonably relied [to its detriment] on Defendants' promise to loan funds...." Am.Compl. at ¶ 27. Under New York law, a promissory estoppel claim requires "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *R.G. Group*, 751 F.2d at 78 (quoting *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (1982) (2d Dep't 1982)).

There was not the requisite "clear and unambiguous promise" by Bankers Trust to the Plaintiffs because the entire history of the parties negotiations made it plain that any promise or agreement at any time during the negotiations, up to and including the discussions centering on the December 22 Draft, was conditional upon the execution and delivery of a written contract. *See R.G. Group*, 751 F.2d at 79; *Reprosystem*, 727 F.2d at 265. Without such a promise, the Plaintiffs' promissory estoppel claim necessarily falls in the face of Bankers Trust's Rule 56 motion.

### 3. *Fraud*

■ The Plaintiffs allege that Bankers Trust defrauded them by knowingly making false statements upon which they relied. However, the record fails to support this allegation.

■ "It is well settled that a cause of action for fraud will not arise when the only fraud charged relates to a breach of contract." *Trusthouse Forte (Garden City) Mgmt. Inc. v. Garden City Hotel, Inc.*, 106 A.D.2d 271, 483 N.Y.S.2d 216, 218 (1st Dep't 1984); *accord Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*, 759 F.Supp. 1039, 1044 (S.D.N.Y.1991). The recognized exception to this rule arises when a party makes a contractual promise with the "undisclosed intention not to perform," and in that situation, a party can be held liable for fraud. *Sabo v. Delman*, 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 718, 143 N.E.2d 906, 910 (1957).

There is no evidence on the record of this motion to support the claim that Bankers Trust perpetrated either an actual or constructive fraud on the Plaintiffs. The explicit provisions in the various versions of the draft agreements that the transactions were conditioned on "duly executed and delivered documents," undercuts the assertion that Bankers Trust made a false promise to make $2,265,-000 available to Frutico.

■ The Plaintiffs' conclusory allegations of intent do not present a triable claim for fraud. A plaintiff's claim for fraud must be supported by "clear and convincing evidence." *See Orderline Wholesale Distrib., Inc. v. Gibbons, Green, Van Amerongen, Ltd.*, 675 F.Supp. 122, 129 (S.D.N.Y.1987); *Edelmann v. National Patent Dev. Corp.*, 656 F.Supp. 1073, 1077 (S.D.N.Y.1987). This is not the case here.

■ Finally, Bankers Trust is entitled to summary judgment on this claim because the Plaintiffs have failed to proffer any evidence that they relied on the allegedly false statements. Under New York law, for a party to be deceived, it must have reasonably relied on the false statement. *See Lanzi v. Brooks,*

54 A.D.2d 1057, 388 N.Y.S.2d 946, 948 (3d Dep't 1976), aff'd, 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977). Only then can the party sustain a claim for fraud. However, the Plaintiffs are unable to show reasonable reliance on Bankers Trust's statements because the numerous draft agreements specifically stated that the parties were not to be bound until they were duly executed and delivered, see Reprosystem, 727 F.2d at 265, and Valentine acknowledged in writing as late as December 8, 1988 that he did not have a commitment from Bankers Trust regarding the $2,265,000.

Therefore, the Defendants are entitled to summary judgment against the Plaintiffs' claim for fraud.

### 4. Negligent Misrepresentation

 The Plaintiffs assert a claim for negligent misrepresentation by contending that "[t]he contractual relationship, joint venture, and general course of dealings between Plaintiffs and Defendants gave rise to a duty on the part of Defendants to impart accurate information to the Plaintiffs." Am.Compl. at ¶ 29. The Plaintiffs contend that this alleged duty was breached when the Defendants represented that a loan for the expansion of Frutico would be forthcoming and then failed to perform as promised.

 In order to state a claim for negligent misrepresentation, Bankers Trust must have misrepresented a fact. See Pappas v. Harrow Stores, Inc., 140 A.D.2d 501, 528 N.Y.S.2d 404, 407 (2d Dep't 1988). Because a negligent promissory misrepresentation is not a misrepresentation of fact, a special relationship must exist between the parties in order for a promissory misrepresentation to give rise to a justiciable claim. See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 252–53 (2d Cir.), cert. denied, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985).

Again, the record on this motion does not support the conclusion that the Alleged Agreement ever become binding on the parties. Thus, because there was no enforceable contract, either oral or written, pursuant to which Bankers Trust was to loan the Plaintiffs $2,265,000, there was no misrepresenta-

tion on Banker Trust's part regarding the loan.

The Plaintiffs also have failed to proffer any evidence to establish that the requisite special relationship existed between the Plaintiffs and Bankers Trust to assert a claim for negligent promissory misrepresentation. See id. at 252 ("the usual relationship of bank and customer is that of debtor and creditor").

In light of the explicit statements on the draft agreements regarding the condition precedent of execution and delivery by the parties before a validly binding agreement would be reached regarding the loan in question, there was no misrepresentation about the time at which the Plaintiffs would have an enforceable commitment from Bankers Trust to proceed with the transactions and make the money in question available to them. Therefore, Bankers Trusts' motion for summary judgment as to the negligent misrepresentation claim is granted.

### 5. Special Relationship

 The Plaintiffs also assert that Bankers Trust breached a duty of good faith and fair dealing in its decision to terminate the Alleged Agreement. However, this claim necessarily fails because it is derivative of the Plaintiffs' cause of action for breach of contract. Under New York law, while an implied covenant of good faith and fair dealing is inherent to every contract, see Grad v. Roberts, 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26, 30 (1964); see also Lowell v. Twin Disc, Inc., 527 F.2d 767, 770 (2d Cir.1975), the duty of good faith and fair dealing cannot be used to create new contractual rights between the parties, see Don King, 742 F.Supp. at 767.

 While parties can bind themselves to an incomplete preliminary agreement by accepting a mutual commitment to negotiate in good faith to reach a final agreement, see Arcadian, 884 F.2d at 71, when no agreement exists, either in principle or in fact, there is no duty to negotiate in good faith that can be enforced against a party to the negotiations, see Reprosystem, 727 F.2d at 264; Ogden Martin, 734 F.Supp. at 1071.

The Plaintiffs have failed to demonstrate that Bankers Trust was bound by any agreement that gave rise to a duty of good faith and fair dealing in negotiating the Alleged Agreement or performing under it. No agreement was reached, and the parties did not owe each other this alleged duty. *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 957 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (applying New York law to a claim regarding an implied covenant of good faith and fair dealing). Therefore, Bankers Trust is entitled to summary judgement as to this claim.

### 6. Breach Of Fiduciary Duty

■ The Plaintiffs allege that:

The history is the transactions between Defendants and Plaintiffs, including but not limited to the Defendants' steps to acquire an equity position in Frutico and to become a joint venturer with Frutico, also gave rise to a fiduciary duty from Defendants to Plaintiffs.

Am.Compl. at ¶ 31. It is contended that Bankers Trust breached this duty.

■ As was noted above, New York law posits a relationship of debtor and creditor between a bank and its customer. *See Durante*, 755 F.2d at 252. As a result, a bank does not owe its customers the kind of fiduciary duties which arise in special relationships between parties. *See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 122 (2d Cir.1984).

■ The present record is devoid of evidence supporting the conclusion that a special relationship existed between Bankers Trust and the Plaintiffs that gave rise to the former owing a fiduciary duty to the latter. As was noted previously, the relationship of bank and customer was not special, and while Bankers Trust did raise the possibility of joining with Frutico in a joint venture, the mere intention to become a joint venturer does not create a fiduciary relationship among the parties to a proposed joint venture. *See Precision Testing Lab. v. Kenyon Corp. of Am.*, 644 F.Supp. 1327, 1348 (S.D.N.Y.1986). An agreement to enter into a joint venture must be finalized before a

fiduciary duty is created. *See id.* No such agreement existed here.

In those situations, like the this one, in which there is no issue of fact regarding the nonexistence of a fiduciary relationship, summary judgment is a proper method of disposing of a claim asserting the breach of the nonexistence duty. *See Official Publications v. Kable News Co.*, 775 F.Supp. 631, 638 (S.D.N.Y.1991). Therefore, Bankers Trusts' Rule 56 motion as to the breach of fiduciary duty claim is granted.

### 7. Prima Facie Tort

■ Finally, the Plaintiffs allege that Bankers Trust's failure to complete the loan of the $2,265,000 in January 1989 constitutes a prima facie tort. This claim necessarily fails because the Plaintiffs have neither alleged nor established the requisite element of malice, to wit, that Bankers Trust intentionally sought to injury the Plaintiffs. *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 333, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459, 468 (1983) (elements of prima facie tort are: intentional infliction of harm; resulting in special damages; without excuse or justification; and by an act or series of otherwise lawful acts); *Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Ass'n*, 58 A.D.2d 177, 396 N.Y.S.2d 925, 927 (4th Dep't 1977) (same); *see also Stratford Group, Ltd. v. Interstate Bakeries*, 590 F.Supp. 859, 865 (S.D.N.Y. 1984) ("the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another"). A claim for prima facie tort is defeated when the defendant's action were motivated to some extent by economic self-interest. *See Rodgers v. Grow–Kiewit Corp.–MK*, 535 F.Supp. 814, 816, *aff'd without op.*, 714 F.2d 116 (2d Cir.1982).

The uncontradicted testimony by the Bankers Trust officers who decided to terminate the negotiations of the Alleged Agreement was that they did so for economic reasons, most notably because of significant changes in Frutico's financial condition, and Valentine acknowledged that Bankers Trust's negotiations with Frutico were affected by the announcement of the Brady Plan. These

economic motives are sufficient to defeat the Plaintiffs' claim for prima facie tort, and Bankers Trust's motion for summary judgment on this cause of action is granted.

### Conclusion

This Court has reviewed the record on this motion within the context of issue-finding rather than issue-resolution, *see Consarc Corp.*, 996 F.2d at 572, and finds that, even when the evidence is viewed in the light most favorable to the Plaintiffs and all reasonable inferences are drawn in their favor, *see Diebold*, 369 U.S. at 655, 82 S.Ct. at 993, a rational trier could not find for the Plaintiffs. Therefore, there is no genuine issue of material fact and entry of summary judgment is appropriate. *See Binder*, 933 F.2d at 191.

For the reasons set forth above, Bankers Trust's Rule 56 motion for summary judgment is granted as to all of the Plaintiffs' claims, and the Amended Complaint is dismissed.

It is so ordered.