In re 50 PINE CO., LLC, Debtor.

50 Pine Co., LLC, Plaintiff,

v.

CapitalSource Finance LLC, Defendant.

Bankruptcy No. 03–12705 (ALG).
Adversary No. 04–02333(ALG).

United States Bankruptcy Court, S.D. New York.

Sept. 30, 2004.

prepared to address future actions by this Court with respect to these matters.

Finkel, Goldstein, Berzow, Rosenbloom & Nash LLP, By Kevin Nash, Esq., New York City, for the Debtor/Plaintiff.

Thacher, Proffitt & Wood LLP, By Christopher F. Graham, Esq., Linda K. Clark, Esq., New York City, for the Defendant.

ALLAN L. GROPPER, Bankruptcy Judge.

On February 12, 2004, 50 Pine Co., LLC (the "Debtor"), filed the complaint in this adversary proceeding against Capital-Source Finance LLC ("CapitalSource"), setting forth the following claims for relief: (1) quasi-contract, (2) unjust enrichment and (3) the avoidance of payments made to CapitalSource as fraudulent conveyances pursuant to § 548 of the Bankruptcy Code.

CapitalSource, in turn, filed a motion to dismiss the complaint for failure to state a claim on which relief can be granted, pursuant to Bankruptcy Rule 7012(b)(6), incorporating Rule 12(b)(6) of the Federal Rules of Civil Procedure. This motion is before the Court for decision.

### The Facts as Alleged in the Complaint

The following facts alleged in the complaint, presented in the light most favorable to the Debtor, are assumed to be true for purposes of this motion.

The Debtor is a special purpose entity which, on October 8, 2002, entered into an agreement to purchase the real property at 50 Pine Street in New York City (the "Property") for the sum of $13,500,000. The Property was a "mixed-use" building consisting of 13 residential apartments, a street level retail store and one commercial office, and the Debtor anticipated developing and converting the building into condominium units. As part of the purchase price, the Debtor made a $450,000 down-payment to the seller of the Property.

Following the agreement to purchase the Property, the Debtor sought mortgage financing and consulted with lenders before ultimately selecting defendant CapitalSource as a likely provider of the financing. The parties subsequently entered into a term sheet, dated February 21, 2003, and executed by the Debtor on March 4, 2003, (the "Term Sheet"). The Term Sheet contained specifications of a proposed loan by CapitalSource to the Debtor, subject to due diligence, internal credit approval by CapitalSource, as well as several other conditions.

The Term Sheet outlined all salient details of the financing of the purchase and development. The total cost of the development, including acquisition and construction expenses, was projected at $16,700,000. The financing structure detailed in the Term Sheet consisted of the following: 1) a mortgage loan from CapitalSource in the amount of $11,300,000 over a two-year term, 2) subordinated financing of $3,100,000, which would be provided by another lender, CIG International LLC, and 3) an equity contribution by the Debtor of $2,300,000.

The Term Sheet provided for a $75,000 Good Faith Deposit (the "Deposit"), upon receipt of which CapitalSource would commence its due diligence. The Debtor alleges in the complaint that in the weeks following the execution of the Term Sheet and the payment of the Deposit, it received repeated assurances from CapitalSource that due diligence was underway and that a final commitment was imminent. The

parties, the Debtor alleges, were working toward a closing, continuing to negotiate the terms of the financing and other matters relating to the mortgage loan. Additionally, the Debtor obtained a commitment from CIG International LLC for the subordinated financing required by the Term Sheet.

According to the allegations of the complaint, shortly before the contemplated closing date of the purchase of the Property, CapitalSource notified the Debtor that it refused to go forward with the loan commitment because of certain rights restrictions in the tenants' underlying residential leases. The Debtor alleges that these reasons were pretextual and advanced in bad faith since CapitalSource either knew, or should have known, the terms of the underlying leases at the time the Term Sheet was executed.

The Debtor further alleges that it relied on the Term Sheet and the assurances of CapitalSource that the mortgage loan would be forthcoming, and therefore that it did not seek out other financing alternatives. As a result of this reliance, and because CapitalSource's refusal came at such a late date, the Debtor claims that it was left with no meaningful choice but to file for Chapter 11 protection in order to protect its $450,000 down-payment on the Property.

The Debtor did, in fact, file for Chapter 11 protection on April 30, 2003. Pursuant to a stipulation in the underlying bankruptcy proceeding, the Debtor resolved its dispute with the seller of the Property over the $450,000 down-payment, retaining $200,000 but forfeiting the remaining $250,000. The Debtor now seeks to recover the damages it claims resulted from CapitalSource's bad faith in conducting the due diligence and refusing to fund the loan.

As noted above, the complaint alleges the following causes of action: 1) that the Term Sheet between the parties created binding obligations of good faith or quasi-contract that were breached by CapitalSource, 2) that defendant was unjustly enriched by its receipt of the $75,000 and received a 3) fraudulent conveyance thereby.[1]

Damages include all or part of the $75,000 Deposit, the $250,000 sum forfeited to the seller of the Property, loss of anticipated profits, accrued interest and the costs of this adversary proceeding.[2]

### *The Applicable Legal Standards*

CapitalSource moves to dismiss the complaint for failure to state a claim under Bankruptcy Rule 7012(b)(6), incorporating Rule 12(b)(6) of the Federal Rules of Civil Procedure. A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a motion to dismiss for failure to state a claim, the Court is obligated to accept the allegations contained in the complaint as true and resolve all reasonable inference in favor of the plaintiff. See *Stuto v. Fleishman,* 164 F.3d 820, 824 (2d Cir.1999).

Under Rule 12(b)(6), a plaintiff's complaint "is deemed to include any written

---

1. As discussed in more detail *infra,* the Debtor's opposition brief also refers to a promissory estoppel claim that was not pleaded in the complaint.

2. Damages for the $250,000 forfeiture and loss of anticipated profits are sought only in connection with the Debtor's First Claim for Relief sounding in quasi-contract. Recovery of the $75,000 Deposit is common to all of the claims.

instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir.1991). Where a plaintiff has relied "on the terms and effect of a document in drafting the complaint" a court may "consider[ ] the document on a dismissal motion..." without converting the 12(b)(6) motion into one for summary judgment *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (collecting cases). See also *Cortec*, 949 F.2d at 48 (holding that where plaintiff has actual notice of a document and relies upon it, the need for "translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."). However, when a party attaches to its motion to dismiss documents which are extrinsic to the complaint, the court must either exclude such documents from consideration or convert the motion to a motion for summary judgment under Rule 56. See Fed.R.Civ.P. 12(b); *Fonte v. Bd. of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir.1988). When a court chooses to convert the motion to one for summary judgment, it must afford "all parties ... reasonable opportunity to present all materials made pertinent to such a motion by Rule 56." Fed. R.Civ.P. 12(b); *Kopec v. Coughlin*, 922 F.2d 152, 154–55 (2d Cir.1991).

In the instant case, the Court at a hearing on the motion determined that it would be appropriate to treat CapitalSource's pleading as a motion to dismiss under 12(b)(6) with respect to count 1 of the complaint but that the motion with respect to counts 2 and 3 would be converted into one for summary judgment. This was based on the fact that, in its reply papers, CapitalSource submitted an affidavit of Christopher Graham and a certification of Pierrette Newman Bradshaw attaching certain documents concerning the nature and use of the Deposit, in an attempt to show that its use of the $75,000 was in accord with the requirements of the Term Sheet. These papers challenged the Debtor's allegations 1) that CapitalSource was unjustly enriched at the Debtor's expense; and 2) that the Debtor did not receive reasonably equivalent value for its payment of the Deposit. At the hearing, the Court gave the Debtor two weeks to take discovery on the unjust enrichment and fraudulent conveyance issues and respond. The Debtor did respond, challenging CapitalSource's redacted account as to its use of the $75,000. We thus have a motion to dismiss as to count 1 and a motion for summary judgment as to counts 2 and 3.

### Discussion

### Breach of Binding Obligations of Good Faith

The gravamen of count 1 of the Debtor's complaint is that the Term Sheet created specific obligations, based either in law or equity, which made it incumbent on CapitalSource to proceed in good faith toward the contractual objectives articulated in the Term Sheet, or at least created obligations between the parties of a quasi-contractual nature. As discussed below, the Debtor's claims must fail as there was an enforceable agreement, thereby precluding a claim in quasi-contract, but that agreement did not impose on Capital-Source the obligations that the Debtor would construct.

██ Under New York law, where parties involved in negotiations have reached preliminary agreements contemplating future negotiations, subsequent approvals or a further contract, binding obligations are not typically created.[3]

3. Although the Term Sheet made no reference to choice of law, "[t]he parties' briefs assume

*Richbell Information Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 297, 765 N.Y.S.2d 575, 583 (1st Dept.2003) (holding term sheet was a "classic example of an unenforceable 'mere agreement to agree.'"). See also, *Adjustrite Systems, Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998); *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir.1996); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984). Parties to a preliminary agreement can bind themselves if they so desire. To the extent that a preliminary agreement creates binding obligations, however, it typically falls into one of the two categories defined by then District Judge Leval in *Teachers Ins. & Annuity Ass'n. v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987). This test was subsequently adopted by the Second Circuit in *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989). See also, *Shann*, 84 F.3d at 77.

The first type of binding preliminary agreement is only preliminary as to form, that is, no further negotiations are required and a memorialization of the agreement, although desired, is not necessary. An agreement of this type is fully binding, reflects the requisite mutual assent, and a party may demand performance despite the fact that a further writing was anticipated. *Tribune*, 670 F.Supp. at 498. The second type, a "binding preliminary commitment," arises where the parties agree on certain terms and bind themselves to negotiate in good faith the remaining open terms. *Id.; Shann*, 84 F.3d at 77. In any case, if a party intends not to be bound by a preliminary writing, and the writings of the parties reflect this

intention, then "the writing is a mere proposal, and neither party has an obligation to negotiate any further." *Cohen v. Lehman Bros. Bank, FSB*, 273 F.Supp.2d 524, 528 (S.D.N.Y.2003). In determining whether parties to a preliminary agreement intend to be mutually bound, "[t]here is a strong presumption against finding binding obligations in agreements which ... call for future approvals...." *Tribune*, 670 F.Supp. at 499.

The Debtor does not claim that the Term Sheet was a binding agreement to extend mortgage financing, but contends that CapitalSource had an enforceable obligation to exercise good faith in conducting due diligence and in making its ultimate decision whether to lend. (Complaint ¶ 11; Debtor's Response to Motion to Dismiss ¶ 6.) Accordingly, the Court's analysis will focus only on the second type of preliminary agreement—a binding preliminary commitment.

The *Tribune* test, adopted by the Second Circuit in *Arcadian*, incorporates several criteria to determine whether parties have entered a binding preliminary commitment. Among the factors are "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form as indicated by the customary form of such transactions." *Arcadian*, 884 F.2d at 72. Disproportionate weight is accorded the first factor since it most clearly expresses the parties' intentions at the time of the preliminary agreement. *Id.* (citing *Tribune*, 670 F.Supp. at 499).

---

that New York law controls, and such 'implied consent ... is sufficient to establish choice of law.'" *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir.2000), quoting *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888

F.2d 239, 242 (2d Cir.1989). There is also little doubt on the admitted facts of this matter that New York law controls. See, e.g., *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 613, 642 N.E.2d 1065 (1994).

In *Arcadian,* the parties had executed a preliminary memorandum detailing certain terms for the sale of the defendant's fertilizer business to the plaintiff, but they included language that referenced the possibility that negotiations might fail and provided that a binding contract of sale would be completed at a future date. Such language, the Court held, conclusively established, as a matter of law, that the preliminary agreement was non-binding. *Id.* By contrast, the preliminary agreement in *Tribune* involved a commitment letter agreement concerning a commercial loan. The Court there found that the language used by the parties, "[u]pon receipt . . . our agreement . . . shall become a binding agreement between us[ ]," was dispositive of the parties' mutual understanding that they were entering into a binding preliminary commitment. *Tribune,* 670 F.Supp. at 499.

■ By claiming that CapitalSource failed to exercise good faith in making its mortgage commitment decision, the Debtor seeks to characterize the Term Sheet as a "binding preliminary commitment" which CapitalSource breached when it failed to move forward in good faith. (Complaint ¶¶ 11, 17–18.) But unlike the agreement in *Tribune,* in which the parties explicitly expressed a binding intention, the Term Sheet repeatedly disclaims any binding commitment. In addition to frequent disclaimers within the text, the following language appears as a footer to every page of the Term Sheet:

> "This Term Sheet is for discussion purposes only. This is not a commitment to extend credit in any form, and remains subject to due diligence, credit approval, and documentation. No oral communications between the parties shall be deemed to supersede this Term Sheet or indicate any commitment to extend credit in any form."

This language is sufficient to preclude the Debtor from attempting to impose liability on CapitalSource for refusing to negotiate in good faith and to proceed to the signing of a binding contractual obligation. As the court held in *Arcadian,* if a party wishes not to be bound by a preliminary agreement, it "can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.' " *Id.* By the same logic, if the Debtor wanted the Term Sheet to be a binding commitment with CapitalSource, it should have refused to accept language which established that the parties did not then bind themselves. *Arcadian,* 884 F.2d at 73.

■ The conclusion reached above, that a binding agreement or commitment did not exist between the parties, also precludes the Debtor's claim for breach of the covenant of good faith. While a covenant of good faith is implied in every contract, the existence of an underlying contractual obligation is presupposed. *Richbell Information Servs.,* 309 A.D.2d at 297, 765 N.Y.S.2d at 583 (finding that analogous term sheet could "not support a claim of breach of contract or of the duty of good faith...."). Here, the Term Sheet agreed to by both parties explicitly disclaims any obligation, either to lend or to negotiate in good faith. "[W]hen no agreement exists, either in principle or in fact, there is no duty to negotiate in good faith that can be enforced against a party to the negotiations...." *Frutico S.A. de C.V. v. Bankers Trust Co.,* 833 F.Supp. 288, 300 (S.D.N.Y.1993). In view of the unambiguous language of the Term Sheet, the Debtor assumed the risk that the loan might not be forthcoming.

The Debtor cites *Warner Theatre Assocs. LP v. Metropolitan Life Insurance Co.,* 1997 WL 685334 (S.D.N.Y.1997), for the proposition that a lender is liable for

breach of the covenant of good faith if it refuses to negotiate. The holding in *Warner Theatre* offers little assistance to the Debtor since, in that case, there was no dispute that there was a valid agreement (giving rise to a covenant of good faith), only that the plaintiff was fraudulently induced to enter into the contract. The Debtor also cites *Jaffe v. Paramount Communications, Inc.*, 222 A.D.2d 17, 22, 644 N.Y.S.2d 43, 47 (1st Dept 1996), quoting *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.S.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978). In both of these cases, the courts found that a covenant of good faith had not been breached. More importantly, however, in neither case did the parties dispute that a contract had actually been formed between the parties.

To the extent that the Debtor's complaint is based on the breach of a covenant of good faith and/or on the existence of a binding preliminary agreement, it is hereby dismissed.

▮ The Debtor also frames its complaint in count 1 in terms of quasi-contract. This alternative theory gains the Debtor nothing. If it is the Debtor's position that the Term Sheet was an enforceable agreement, then a quasi-contract claim would fail because New York law bars recovery in quasi-contract where a valid contract governs the same subject matter. See *In re First Central Fin. Corp.*, 377 F.3d 209, 214 (2d Cir.2004), citing *In re Stylesite Mktg., Inc.*, 253 B.R. 503, 507–08 (Bankr. S.D.N.Y.2000); *Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987). Conversely, if by pleading a quasi-contract claim, the Debtor acknowledges that there was no enforceable agreement, then there can be no implied covenant of good faith which binds the parties. See *Ogden Martin Systems of Tulsa, Inc. v. Tri–Conti-*

*nental Leasing Corp.*, 734 F.Supp. 1057, 1071 (S.D.N.Y.1990).

### Promissory Estoppel

▮ In its opposition to the motion, the Debtor also purports to assert a claim based on promissory estoppel. A plaintiff may not bootstrap a claim into a complaint merely by discussing it in its opposition brief. See *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 526 (S.D.N.Y.1977) ("a party is not entitled to amend his pleading through statements in his brief"). In any event, even if such a cause of action had been pleaded, it would not meet the requirements of New York for a promissory estoppel claim, namely, a "clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc. v. Le Havre Associates*, 88 A.D.2d 120, 123, 452 N.Y.S.2d 447, 449 (2d Dept.1982).

In its papers, the Debtor asserts that it detrimentally relied on the Term Sheet and on subsequent assurances by Capital-Source that a commitment would be forthcoming. Under New York law, however, the elements of a promissory estoppel claim also require that the injured party demonstrate that there was a "clear and unambiguous promise" on which it relied to its detriment, and that such reliance was foreseeable to the promisor. The Debtor never alleges in its complaint that CapitalSource made a clear and unambiguous promise to lend, and that it was foreseeable that the Debtor would rely on any such promise. Indeed, the reservation by CapitalSource in the Term Sheet of the right to refuse to consummate the loan

belies any claim that it induced foreseeable reliance in the Debtor.

In *Arcadian,* upon which the Debtor relies, the Second Circuit reversed an order of summary judgment for the defendant on a plaintiff's promissory estoppel claim. Although the court found that there was no preliminary binding agreement between the parties, the court, nevertheless, determined that there was a genuine issue of material fact "as to whether [defendant] made a clear and unambiguous promise to negotiate in good faith." *Arcadian,* 884 F.2d at 74. The *Arcadian* court was persuaded by evidence that the defendant, despite knowing of and approving expenses and collateral agreements by the plaintiff, abruptly changed its position and called off negotiations when the plaintiff refused to capitulate to the defendant's proposed modifications. *Id.*

Like the parties in *Arcadian,* CapitalSource and the Debtor memorialized the potential terms of an agreement in a preliminary document, but that is as far as the similarity goes. Unlike the plaintiff in *Arcadian,* the Debtor did not enter into collateral contracts or incur expenses on the basis of any "clear and unambiguous promise" made by CapitalSource to the Debtor. The agreement to purchase the Property was entered into by the Debtor prior to any contact with CapitalSource. Moreover, dismissal is proper here in light of the Debtor's inability to plead facts that overcome the numerous disclaimers contained in the Term Sheet to the effect that, after due diligence, CapitalSource could decide not to consummate the loan.

In *Cohen v. Lehman Bros.,* 273 F.Supp.2d at 530, and *Frutico v. Bankers Trust Co.,* 833 F.Supp. at 288, the District Courts dismissed the plaintiffs' promissory estoppel claims in circumstances similar to those at bar, distinguishing *Arcadian.* In both cases the litigants were parties involved in negotiations preliminary to a lending agreement. Likewise, in both cases, language in the preliminary documents, agreed to by both parties, reserved the lender's option to decline to lend "at its sole discretion," or made the commitment "conditional upon ... a written contract." Both courts held that this language vitiated any claims by the plaintiffs that the prospective lender had made a "clear and unambiguous promise" to lend or to negotiate in good faith.

Accordingly, the Debtor would not have a viable claim sounding in promissory estoppel.

### Unjust Enrichment

The Debtor's complaint in the second count asserts a claim for unjust enrichment on the ground that CapitalSource has failed to account for the $75,000 Deposit. The crux of the Debtor's argument is that the expenses incurred by CapitalSource in performing its due diligence were either not disclosed or were unreasonable and that CapitalSource must provide evidence that it earned the right to apply the full Deposit to its costs.

▇▇▇▇ Unjust enrichment is an equitable doctrine predicated on the principle that a party should not be permitted to enrich itself at another's expense. *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 263 (2d Cir.1984). Although the Debtor has asserted this claim as one for unjust enrichment, it is probably more fairly cast as a simple breach of contract claim. The Term Sheet was not a binding instrument otherwise, but the clause relating to the Deposit established the terms and conditions thereof. That clause provided: "If the loan is not approved based substantially upon this proposal, the deposit will be returned to Borrower, without interest, less any verified out-of-pocket costs and

expenses incurred by CapitalSource." (Term Sheet at p. 6, Graham Aff. Ex. 1.) There was thus a commitment by the defendant that if the mortgage loan was not consummated, the Deposit would be returned to the Debtor less any out-of-pocket costs verified as incurred by Capital-Source in performing its due diligence.

As noted above, CapitalSource submitted an accounting ledger which asserts that expenses and fees associated with the due diligence amounted to $78,816. (Bradshaw Cert. Ex. C.) At the hearing noted above, the Court found that the accounting did not provide adequate detail to determine the reasonableness of the expenses, and the parties agreed that CapitalSource would produce an accounting further detailing its expenditures. In its further submission, CapitalSource provided documentation indicating that the bulk of the $75,000 Deposit was expended on attorneys' fees in conducting due diligence. However, while attorneys' timesheets were provided, all descriptions of services rendered were redacted in their entirety, preventing the Court and the Debtor from making any determination of the reasonableness of the cost of the services.

■ While information covered by the attorney-client privilege may be redacted, information not covered by the privilege needs to be produced. *Blumenthal v. Drudge*, 186 F.R.D. 236, 243–44 (D.D.C. 1999). A more meaningful accounting of how the Debtor's $75,000 Deposit was spent is surely possible. Attorney timesheets containing a description of services rendered and the charges therefore are routinely disclosed, and it is impossible that all descriptions of services required redaction to accommodate the attorney-client privilege. CapitalSource also put "at issue" the amount and reasonableness of its attorneys' fees. It thereby waived the privilege to the extent necessary to

determine this issue. See *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, Nos. 90–5052–PHX–GBN, 90–5075–PHX–GBN, 1996 WL 529399, at *4 (Bankr.S.D.N.Y.1996).

A question was also raised by the Debtor as to the propriety of charges by CapitalSource's inside counsel. Whether these are proper "out-of-pocket" costs and expenses cannot be decided until we know what the attorneys did.

Because adequate information has not been provided and there exists a genuine issue of material fact as to the reasonableness of the fees charged against the Debtor's $75,000 Deposit, CapitalSource's motion for summary judgment on the unjust enrichment claim is denied.

### Avoidance of the Deposit as a Fraudulent Transfer

■ In the third count, the Debtor seeks to avoid the $75,000 Deposit as a fraudulent conveyance under § 548 of the Bankruptcy Code. The thrust of the Debtor's claim is that it received little or no reasonably equivalent value in exchange for the Deposit as a result of Capital-Source's bad faith. The elements of a constructive fraudulent transfer claim consist of: "(1) a transfer of the debtor's property, (2) while the debtor was insolvent or which rendered the debtor insolvent (3) for less than reasonably equivalent value (under bankruptcy law) or fair consideration (under New York law)." *In re Trace Int'l Holdings*, 301 B.R. 801, 805 (Bankr.S.D.N.Y.2003).

■ For purposes of the instant motions, assuming *arguendo* that the Debtor was insolvent on the date of payment, the question is whether the Debtor received reasonably equivalent value or fair consideration for its $75,000. CapitalSource has supplied evidence of the fees and expenses it incurred in conducting due diligence, but

with insufficient detail by which to determine the legitimacy of the expenses.

As with the unjust enrichment claim, a genuine issue of material fact remains as to the consideration the Debtor received for the Deposit. Accordingly, Capital-Source's motion for summary judgment on the Debtor's fraudulent transfer claim is denied.

### Conclusion

The motion to dismiss count 1 of the complaint is granted. The motion to dismiss the Debtor's unjust enrichment and fraudulent conveyance claims is converted into a motion for summary judgment as to those claims, and summary judgment is denied. CapitalSource shall settle an order on five days' notice, and the parties shall contact chambers thereafter to schedule a conference on the remaining issues.