# In re THEATRE ROW PHASE II ASSOCIATES, Debtor.

## Request of Madison Equities, LLC for Payment of Administrative Expenses,

### and

## Madison Equities, LLC, Plaintiff,

### v.

## William J. Condren, Defendant.

### Bankruptcy No. 03–10134 (PCB).
### Adversary No. 04–04718 (PCB).

### United States Bankruptcy Court, S.D. New York.

### April 11, 2008.

Hass & Gottlieb, by Lawrence M. Gottlieb, Esq., Scarsdale, NY, M. Stuart Goldberg LLC, by Marc Stuart Goldberg, Esq., White Plains, NY, for Madison Equities, LLC.

Robinson Brog Leinwand Greene Genovese & Gluck, P.C., by Robert Leinwand, Esq., David Burger, Esq., New York, NY, for Debtor.

Gabriela P. Cacucci, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for the City of New York.

## *MEMORANDUM DECISION GRANTING MOTION TO DISMISS*

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

Theatre Row Phase II Associates, the debtor (the "Debtor") in this confirmed Chapter 11 case, was formerly the owner of the entire city block in Manhattan located between 10th Avenue and Dyer Avenue and bounded by 42nd Street on the north and 41st Street on the south (the "Property"). Pursuant to an order of the Court, the Debtor was authorized to sell the Property to TRM Associates, L.L.C. ("TRM"). Following the sale of the Property and confirmation of a Chapter 11 plan, Madison Equities, LLC ("Madison"), who had been negotiating for the acquisition of the Property with the Debtor for many months prior to its sale to TRM, made a motion seeking payment of over $20 million in administrative expense claims (the "Request"). Shortly after filing the Request, Madison commenced an adversary proceeding against William J. Condren ("Condren"), the co-general partner of the Debtor. The factual allegations in the Request are identical to those made in the complaint in the adversary proceeding (the "Complaint").[1]

In response to the Request and Complaint, the Debtor and Condren filed a joint Motion to Dismiss. For the reasons set forth below, the Court grants the Motion to Dismiss the Request and the Complaint.

*Statement of Facts* [2]

1. On January 10, 2003 (the "Filing Date") the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Code").[3] The Debtor is a New York limited partnership.[4]

---

1. Based on the court's reading of Madison's papers, the Complaint against Condren is duplicative of the Request against the Debtor, although the legal theories differ.

2. The Statement of Facts incorporates by reference all of the factual allegations made in the Request (ECF No. 161) and the Complaint (A.P. ECF No. 1), without, however, adopting any of the defined terms used in those documents. The defined terms are merely conclusory and this court need not, and does not, accept them as true on this motion to dismiss. Familiarity with the Request and the Complaint are presumed. The Statement of Facts incorporates the most salient factual allegations for ease of reference.

3. All references to the Bankruptcy Code refer to the Bankruptcy Code as in effect prior to the changes made in mid-October 2005.

4. Dyer Avenue Local Development Corporation ("Dyer") was the only general partner other than Condren. See ECF No. 27. The Debtor commenced an adversary proceeding in mid–2003 against EHR Investments after EHR asserted that it had the right to control the limited partnership interests not owned by

2. As of the Filing Date the Debtor had been the ground lessee of the Property since the early 1980's. The Property is located in an area that was known as Theatre Row and was one of various revitalization efforts of the City of New York undertaken in the early 1980's.[5] The City of New York was the landlord under the Debtor's ground lease. The 40–year ground lease contained the right to one 10–year renewal term as well as granting the ground lessee the option to purchase the Property under certain circumstances for $100,000. The original ground lease transaction also involved the granting of several mortgages that were unpaid at the Filing Date. There was a small mortgage of about $450,000 held by the Ford Foundation. In addition there were significantly more substantial mortgages held by the City of New York's Economic Development Corporation ("EDC") and the Department of Citywide Administrative Services ("DCAS") (hereafter together with the City of New York, the "City") that had been granted as part of the original ground lease transaction. EDC filed a proof of claim in the amount for about $3.6 million. DCAS filed a proof of claim in the amount for approximately $7.7 million.

3. Debtor's major source of income was from leasing out the old Westside Airlines terminal located on a portion of the Property to various recording studios.[6] Before the Filing Date, the Debtor and the tenant of that building had a dispute that ultimately went to arbitration over the rental due for a renewal term. The Debtor also had other disputes with the tenant over what it viewed as unlawful subleasing of certain of the leased space by the tenant. The arbitration award fixed a very substantially increased rental rate for the renewal term. Prior to the Filing Date, the tenant had ceased paying rent and had moved out abruptly after the award was issued. This left the Debtor without an adequate source of income to meet its obligations under the ground lease and as well as on the mortgages.

4. Shortly after the Filing Date and on January 18, 2003, the Debtor filed an adversary proceeding against the City seeking to have this court determine the proper calculation of the interest due on to the City on one of the mortgages, which raised complex legal issues and involved certain disputed facts. See A.P. 03–02056. In addition an action pending in the state court, which involved the City's attempt to

5. The revitalization efforts included the very successful redevelopment of the Times Square area, which is just blocks east of the Property.

6. At the time of the filing of the Chapter 11 petition there were several small theatres on the Property as well as a couple of restaurants in addition to the Westside Airlines Terminal. The Property is located immediately west of the Port Authority Bus Terminal, a major terminus for commuter buses from New Jersey.

the general partners. See A.P. 03–08926. The amended complaint in that adversary proceeding stated at ¶ 20 that Condren owned 33.7060% of the limited partnership interests. At ¶ 51 the amended complaint alleged the partnership agreement required the consent of 51 % of the limited partners to any sale of the Property. Thus while Condren was both a general and limited partner of the Debtor, and its managing partner, he lacked the legal authority to dispose of the Property without the consent of others. The proper identity of the other limited partners, who were all unrelated to Condren, was ultimately resolved amicably prior to confirmation of the Chapter 11 plan.

collect the unpaid rent on the ground lease, was removed to the federal district court and referred to the bankruptcy court. See A.P. 03–02056. Both these litigations were contentious. See, e.g., Transcript 7/22/2004 (ECF No. 123). In addition to the disputes over the mortgage and lease payments, the City made numerous objections throughout the Chapter 11 case to such things as the Debtor's request for extensions of time to file a Chapter 11 plan.[7]

5. Realization of value from the Property sufficient to keep the ground lease payments current and pay the mortgages was an overarching objective of the Chapter 11 case because of the Debtor's illiquid state. Although the Debtor valued its interest in the Property on its schedules for an amount in excess of the amounts due on the outstanding mortgages, it needed the protection of Chapter 11 and the automatic stay to achieve a recovery satisfactory to its general and limited partners, as well as to deal with the City's claims.

6. From the Request and the Complaint it appears that in an effort to reach that goal, among other things, the Debtor, through Condren its managing partner, engaged in negotiations with Madison over the terms of a possible ground lease for the Property from late 2002, throughout 2003 and into Summer 2004. The Request and Complaint contain much detail about those negotiations. Just less than a year after the Filing Date, Condren sent a letter dated January 2, 2004 to Robert Gladstone ("Gladstone"), the managing member of Madison. Condren's January 2nd letter requested that Gladstone reconsider two provisions of Madison's proposal, including the provision for the rent during the initial term and the provision regarding rent during construction.[8] The letter included the following language: "In consideration of the long and sustained effort you have already invested in this project, you are entitled to and are getting a last look." This so-called last look language ("Last Look Language") is repeatedly referred to by Madison in the Request and the Complaint. Condren also advised Gladstone in the letter that he was "in receipt of another offer from another developer" for the Property.

7. Madison and Condren continued to engage in negotiations after January 2004. While Condren's co-partner, Dyer, had been content until around mid-April 2004 to allow Condren to move forward with his negotiations, at that time Dyer solicited or received a cash offer of $60 million for the purchase of the Property from the Brodsky Organization. Condren was opposed to the Brodsky offer.[9] The City was also interested in the $60 million offer from the Brodsky Organization. See ECF No. 106.

8. In the Spring of 2004, the City began discussions with the Debtor over a

---

7. Nowhere in the Request or the Complaint does Madison acknowledge the significant litigation activity going on in the bankruptcy court in the Spring and Summer of 2004 involving the City claims and the Debtor.

8. At the time this letter was sent, the deal being negotiated was in the form of a ground lease, not a sale.

9. Under the terms of the partnership agreement, Dyer was entitled to a fixed payment and would have received no economic benefit from a higher offer. See ECF No. 106, 108.

proposal of the Metropolitan Transit Authority (the "MTA") to extend the No. 7 subway line from the Port Authority further West, which would include placement of subway exits on the Property as well as possible utilization of a portion of the Property as a staging area for the subway construction. Madison was opposed to the placement of anything related to the subway on the Property. Madison alleges that Condren supported Madison's opposition to the City's subway plans with respect to the Property. Complaint ¶ 114. However, it is undisputed that in or about May 2004 Madison met directly with the City to discuss the subway issue in an attempt to resolve it satisfactorily. Condren consented to the meetings but did not attend. The City was seeking to reach an amicable but immediate agreement on the subway placement issues on the Property in the absence of which it was prepared to commence partial condemnation proceedings. The extension of the subway over the Property was but one element of a larger development project for other city-owned or controlled property located several blocks west of the Property.

9. The negotiations between the Debtor and Madison reached their apparent culmination in early August 2004 when a final draft ground lease between Madison and the Debtor was circulated. See Request ¶¶ 117–118. Condren then advised Madison that, rather than a ground lease, his partners were seeking to sell the Property. See Request ¶ 120. Madison does not allege that the change in the nature of the transaction from a ground lease to a sale was unacceptable to it. According to Madison, Condren stated that he had a purchase offer in hand from TRM of $100 million plus an additional $2.5 million payment to the City. See Request ¶ 121. The Request and Complaint detail further statements alleged to have been made by Condren in which he in words or substance agreed that Madison could have the deal at $105 million. Complaint ¶ 122–123. Thereafter Condren advised Madison that TRM had raised its offer to $107 million in addition to certain amounts on the City Claims and it stated to have again agreed to allow Madison a "last look". Complaint ¶ 127.

10. Madison states that it matched the TRM offer and Condren agreed they had a deal. Complaint ¶ 128. A ten-hour negotiation session occurred on August 11, 2004. Complaint ¶ 130. Following the negotiation session at approximately 1:37 a.m. on August 13, 2004, a final execution copy of a purchase and sale agreement between Madison and the Debtor was transmitted to both sides for final review. It appears that execution was expected to occur later in the day on August 13. It is undisputed that the agreement contained a provision that it would not be effective unless and until it was signed. That agreement was never signed.

11. According to the Complaint, ¶¶ 134–5, Condren made representations to Gladstone on August 13 and August 14 that the agreement would be signed. On the evening of August 15, Condren advised Madison that the Debtor had entered into a deal for the sale of the Property with TRM on the evening of August 13. Complaint ¶ 137.[10] As part of the deal with

---

**10.** Condren apparently advised Madison that the TRM deal was at a higher price than the

TRM Condren stated that he had committed himself personally to a $10 million guaranty not to offer the deal to others and advised Madison that as a result he could no longer consider any further negotiations with Madison. Complaint ¶ 140.

12. The Debtor scheduled its Disclosure Statement hearing for September 22, 2004. ECF No. 126–127. The City filed an objection to the Debtor's Disclosure Statement. ECF No. 135. Attached to the City's objection was a document dated July 22, 2004 entitled "Binding Agreement" (the "Binding Agreement"). Neither the Court or Madison were aware of the Binding Agreement prior to its submission by the City. The Binding Agreement was entered into at a time when the Debtor was seeking an extension of the exclusive period to file its Chapter 11 plan. A key provision of the Binding Agreement was that it fixed the Debtor's final period for the extension of exclusivity as well as fixing the date by which confirmation had to occur, both issues of major concern to the City. In another key provision in the Binding Agreement, the City and TP42, a TRM entity, agreed to a payoff figure with respect the City mortgages as well as to a resolution of the MTA No. 7 Line extension issues.[11] However, although it was termed a Binding Agreement, there was nothing in the agreement which committed the Debtor to TP42 and so it was not binding in that regard.

13. In mid September the Debtor gave notice of hearing for October 5, 2004 at which it would seek Court approval of the agreement with TRM.[12] Two objections were filed. The City objected for several different reasons. Prior to the hearing, the City resolved its issues and ultimately withdrew its objection. Madison also filed an objection to the sale. Madison believed it had not been given a fair opportunity to bid and that it had in fact made a higher offer than TRM for the Property.

14. The Court held a hearing on October 6, 2004 on the Debtor's application. The court overruled Madison's objection for several reasons. The court found *inter alia* that it was not necessary that there be a formal auction in a setting in which all creditors would be paid in full and that all of the partners, general and limited, had approved the transaction. Importantly the City was in favor of the transaction with TRM because it had reached an agreement with TRM on the subway issues. The City was opposed to any transaction with Madison because Madison had been inflexible in its negotiations with the City

---

price in the contract ultimately put before the court for approval. Complaint ¶¶ 138–9.

**11.** The Binding Agreement contained a provision stating that "the Debtor and the City shall advise the Court that they are attempting to reach agreement concerning a consensual plan without specifically identifying TP42."

**12.** While the sale agreement actually contained a provision for a break-up fee should TRM not end up as the final purchaser of the Property in addition to the Condren guaranty, the application submitted to the court did not provide for a bidding process. Break-up fees require court approval and the application for approval of a sale that contains a break-up fee normally provides for a hearing for approval of the break-up fee prior to the hearing to approve the sale. See *In re Global Crossing Ltd.*, 295 B.R. 726, 742–43 (Bankr.S.D.N.Y. 2003). However, here, court approval of the break-up fee was not sought prior to the sale hearing.

and had never to come to an acceptable agreement with the City with respect to the extension of the No. 7 subway line over part of the Property. The court approved the TRM offer as the best offer for the Property. Transcript, 10/6/2004 (ECF No. 156). Madison did not take an appeal from the October 13, 2004 order approving the sale to TRM. Subsequent to court approval the transaction with TRM closed and the Debtor received $103.2 million. The amount received by the Debtor is sufficient to pay all claims, including Madison's if allowed, as well as make a substantial distribution to the Debtor's general and limited partners.

15. The Debtor's Chapter 11 plan was confirmed on October 25, 2004.[13]

16. Madison filed the Request after confirmation and on November 9, 2004.

17. About a month after filing the Request, Madison commenced an adversary proceeding against Condren as the Debtor's general partner. The Complaint is identical to the Request except that "Condren" is substituted for the "Debtor" and the legal theories differ. In addition, Madison asserts a punitive damage claim against Condren.

18. There are two claims asserted by Madison in the Request and Complaint. The first one is for $18.2 million (the "Profit Claim"). Madison calculates the Profit Claim by claiming it added $50 million to price of the Property. This $50 million is the alleged difference between an all-cash bid the Debtor received from a third party and the final price paid by TRM for the Property, discounted at an applied rate of 25%. Request ¶ 167; ECF No. 176.

19. The second claim is one for $2.04 million based on the expenses Madison alleged it incurred in pursuing the acquisition of the Property. The out of pocket expenses Madison alleges it incurred include fees paid to engineers, an architect, attorneys, consultants, $1 million in overhead as well as certain miscellaneous fees.[14]

20. On January 12, 2005, the Debtor and Condren filed a Motion to Dismiss the Request and the Complaint for failure to state legally cognizable claims. Madison filed papers in opposition to the motion.

*Discussion*

*Standard for a Motion to Dismiss*

On this dual Motion to Dismiss, the Court must look to both Bankruptcy Rule 9114(c) and Bankruptcy Rule 7012. Rule 9014(c) states that the Court may direct the application of one or more of the rules in Part VII which governs adversary proceedings, in addition to those listed in Rule 9104 when determining contested matters. No party has objected to the application of Rule 7012 to the contested matter.

Bankruptcy Rule 7012 makes Federal Rule of Civil Procedure ("FRCP") 12(b)(6)

---

**13.** Dyer submitted a limited objection to confirmation of the plan. ECF No. 150. Dyer did not object to the transaction with TRM but it did object to any alternative, but undelineated plan, should the TRM transaction not close.

**14.** Madison asserts for example, that among other things, it was induced to expend monies to explore Condren's idea of building the mother of all garages on the Property, something ultimately determined not to be feasible. See Complaint ¶¶ 30–37. However at no point in its lengthy narrative Request and Complaint does Madison state that it asked Condren personally or on behalf of the Debtor to pay or contribute to Madison's concept development or other expenses.

applicable to adversary proceedings. On a FRCP 12(b)(6) motion, "a court merely assesses the legal feasibility of a complaint." See *In re Bayou Group LLC*, 362 B.R. 624, 632 (Bankr.S.D.N.Y.2007). A court must "accept all factual allegations in the complaint as true." See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, — U.S. —, —, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007); accord *Bell Atlantic Corp. v. Twombly*, — U.S. —, —, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

In order to avoid dismissal on a FRCP 12(b)(6) motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." See *Twombly* at 1974, or, put otherwise, to "possess enough heft to 'show that the pleader is entitled to relief,'" *Id.* at 1966. *Twombly* creates "a flexible 'plausibility standard' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." See *Iqbal v. Hasty*, 490 F.3d 143, 157–158 (2d Cir.2007) (emphasis in original); See also *In re Musicland Holding Corp.*, 374 B.R. 113, 119 (Bankr.S.D.N.Y.2007).

■ Courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on a Rule 12(b)(6) motions to dismiss, in particular, documents incorporated in to the complaint by reference, and matters of which a court may take judicial notice." See *Tellabs* at 2509. Moreover, in deciding a FRCP 12(b)(6) motion the Court can look to documents that were not incorporated to the complaint by reference but were integral to the complaint. See *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992) (the court considered documents that were attached to the motion to dismiss because the debtor had notice of the facts contained within the documents and the debtor relied on such facts in forming the complaint). In a bankruptcy case, the court can take judicial notice of all of the documents filed in the case although it must not make factual findings about disputed facts from those documents. For example, it is a matter of record in this Chapter 11 case that there were three adversary proceedings filed (in addition to the one against Condren) and the court can take note of the contents of the various pleadings in those adversary proceedings, as well as pleadings and other documents in the case itself.

While on a motion to dismiss, well-pleaded allegations must be considered to be true "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss" from being granted.[15] See *Campbell v. San Antonio*, 43 F.3d 973, 975 (5th Cir.1995) (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993)); see also *Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 23–24 (1st Cir. 1990). This Court will ignore as merely conclusory allegations the many definitions

---

15. In support of the motion to dismiss, an affidavit of Condren containing factual matters was offered. *See* ECF No. 174. The court is excluding the facts offered and declining to convert the motion to dismiss to one for summary judgment. *See* FRCP 12(d).

Madison has submitted the affidavit of Lawrence M. Gottlieb to which is attached a copy of the Complaint, excerpts from a deposition of Condren and a June 22, 2004 letter from Burger to the court. The letter to the court adds nothing not already in the record. The deposition excerpts contain nothing that assists Madison's position, although they do confirm that Condren was willing to condone Burger's lack of candor with the court. The Gottlieb affidavit, while reviewed by the court, is therefore excluded for FRCP 12(d) purposes.

and compounded and pyramided definitions used in the Request and the Complaint. For example, the term "Last Look Representation" is conclusory if it is intended to be more than a mere shorthand reference to certain language in Condren's January 2nd letter.

As more fully set forth below, neither the Request nor the Complaint can survive a motion to dismiss because even if all the facts are taken as true, the facts do not establish any claim or cause of action against the Debtor or Condren.

### Madison's Profit Claim

Madison asserts two claims. The first is the $18.2 million Profit Claim. As against the Debtor the Profit Claim is asserted as an expense of administration. The Profit Claim is also made against Condren as the Debtor's managing general partner but it is based on a legal theory of common law fraud.

■■■■ Administrative expenses are created by transactions entered into by the debtor-in-possession in the ordinary course of business during the course of a Chapter 11 case. Under the standard set forth in Code § 503(b)(1), administrative expenses are the "actual, necessary costs and expenses of preserving the estate." The Code § 503(b)(1) test insures that there will be "some judicial control over the determination of what [ ] contract will be granted administrative expense priority." See *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25 (2nd Cir.1996). Normally expenses of administration arise from acts that are beneficial to the estate. See *In re New York Trap Rock Corp.*, 137 B.R. 568,

572 (Bankr.S.D.N.Y.1992). However it has been established since the Supreme Court's decision in *Reading v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), that administration expenses can also be allowed for acts done in the administration of the estate that do not benefit the estate but which harm non-debtors. An allowable claim for an expense of administration must have a satisfactory basis in law other than Code § 503(a)(1), such as contract or tort, as well as factual validity.

■■■■ As more fully detailed below, this court concludes that Madison does not have an allowable administration expense claim for the Profit Claim, whether the claim is viewed either as one for a benefit imposed on the Debtor or a detriment incurred by Madison. Madison fails because it cannot show the necessary contractual (or tort) basis on which to impose liability despite Madison's valiant pleading efforts in conflating the Last Look Language definition. This is not a case in which there was a preliminary written agreement between the Debtor and Madison but no final agreement was reached. See *Teachers Insurance and Annuity Association v. Tribune Co.*, 670 F.Supp. 491, 499 (S.D.N.Y.1987).[16] The Last Look Language was contained in a letter that referred to another bidder as well as indicating that certain terms proposed by Madison were not acceptable to the Debtor. The Last Look Language was a gratuitous gesture. There are not even details that indicate how and when the last look was to be provided. Certainly it was too vague to constitute a right of first refusal.[17] In addition the deal morphed in

---

16. In determining whether there is intent to be bound, the Court must consider "(1) the language of the [written] agreement; (2) the context of negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final

form." See *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989) *(citing Teachers at 499–503).*

17. Under the New York Statute of Frauds, NYGOL § 5–703(2), "A contract for the leas-

Summer 2004 from a ground lease into a sale. There is no question but that the Debtor was courting Madison, but it was also courting others as it told Madison. Madison was chasing what proved to be a fickle seller.

■ Madison was aware that the Debtor was in bankruptcy and that the Property was the sole asset of the Debtor. It cannot be disputed that the sole asset of a Chapter 11 debtor cannot be sold without court approval. See Code § 363(b)(1) and (c)(1). In fact, a Chapter 11 debtor cannot enter into a binding contract to sell its sole asset without approval from the bankruptcy court.[18] In the end, Madison is nothing more or less than a disappointed prospective buyer.

■ The Complaint, although factually identical to the Request, seeks relief against Condren based on a different legal theory, i.e., common law fraud.[19] Madison does not fare better by recasting its Profit Claim as one against Condren for common law fraud. Fraud must be pled with particularity under Bankruptcy Rule 9 incorporating FRCP 9(b). The Complaint is pled with great particularity. Indeed it contains 157 detailed paragraphs and is twenty-five pages long.

■ A cause of action for common law fraud requires that the plaintiff prove (1) there was false representation or omission of a material fact, (2) it justifiably relied on that representation, (3) the representation was intentionally made to induce the plaintiff to rely and (4) there was an actual injury as a result of such reliance. See Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668

ing for a longer period than one year, or for the sale, of any real property* * * is void unless the contract or some note or memorandum thereof, expressing consideration, is in writing, subscribed by the party to be charged." While this court reaches its decision on other grounds, it seems unlikely that any of the various writing that Madison has invoked would qualify as a "writing" under the New York State of Frauds.

18. Under the Code, it was not necessary for Condren as the managing general partner of the Debtor to obtain authority from the bankruptcy court to engage in negotiations for the sale or lease of the Property. In that respect his authority derived from the partnership agreement and partnership law.

19. In addition Madison seeks punitive damages. It cannot recover on punitive damages on either of the two claims. To recover punitive damages there must be a wrong against the public interest. If the harm is solely against a private interest, punitive damages are not available. See Edison v. Viva Intern., Ltd., 70 A.D.2d 379, 421 N.Y.S.2d 203 (1st Dep't 1979). Madison has failed to plead any facts, and the Court is unable to imagine any facts it could plead, that would indicate harm to the public interest. The only interest harmed, if any, is the private interest of Madison. Punitive damages are punishment and are intended to deter similar conduct to that of the defendant's in a particular case. See Adelman v. Adelman, 191 Misc.2d 281, 741 N.Y.S.2d 841 (2002). If no valid underlying claim exists for which compensatory damages could be recovered, then no claim for punitive damages can stand. See Prote Contracting Co., Inc. v. Board of Educ. Of City of New York, 276 A.D.2d 309, 714 N.Y.S.2d 36 (1st Dep't 2000). To recover punitive damages related to an underlying tort claim, one must assert actual malice. See 300 West Realty Co. v. City of New York, 57 A.D.2d 805, 394 N.Y.S.2d 697 (1st Dep't 1977). Since this Court finds that no claim exists against Condren for common law fraud, it is evident that Madison has not plead any facts sufficient to show actual malice. Generally, punitive damages are not available when the underlying claim sounds in contract. Punitive damages can be recoverable for breach of contract, only if there is a showing of gross, wanton or willful fraud of the defendant. See Reinah Development Corp. v. Kaaterskill Hotel Corp., 59 N.Y.2d 482, 465 N.Y.S.2d 910, 452 N.E.2d 1238 (1983). No contract existed between Madison and the Debtor and therefore there is no underlying claim for which to support punitive damages.

N.E.2d 1370 (1996) (citing *Channel Master Corp. v. Aluminum Ltd. Sales,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); See also *New York University v. Continental Ins. Co.,* 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995)). All of the factors must be satisfied.

 However, despite the particularity with which it plead, unfortunately for Madison, the allegations of the Complaint simply fail to add up to a strong inference of fraudulent intent.[20] There is nothing in the Complaint from which *any* inference can be drawn that at the outset the negotiations with Madison in 2002 or at the time the Last Look Language letter was sent that Condren had a definite intention *not* to enter into a deal with Madison. Without that Madison cannot prove that Condren made a misrepresentation of fact on which to base an action for common law fraud. All of Madison's painstaking pleading efforts to compound various events that occurred in 2004 into one grand misrepresentation of intent by Condren also fail. They fail because Madison has acknowledged that it is a sophisticated developer in the New York metropolitan area. Many of the supposed representations were equivocal. In other instances Madison had the means to determine the true facts. For example, the disputes with the City were recorded on both the case docket and the dockets in the two adversary proceedings with the City and discussed in open court at many hearings. Surely Madison did not need the Debtor through Condren to tell it that the City would play a large role in the resolution of the Chapter 11 case or that the Debtor could not afford the time or expense of litigating with the City over the subway issues before disposing of its interest in the Property. Nor indeed it is reasonable to think that any developer would want the Debtor to negotiate with the City over where the subway was to be placed since the placement would affect the developer, not the Debtor.

The adversary proceeding with EHR contained information about who the partners were and made clear that Condren did not hold the majority equity interest in the partnership. When at the end of May 2004 Madison became concerned about Condren's authority because of objections made by Dyer, Madison was willing to rely on a mealy mouthed letter from the Debtor's attorney that admitted that Dyer had a voice as general partner until it was paid an agreed amount. Complaint ¶¶ 92–95; Complaint, Exhibit F. Given that the Debtor had no known source of funds to pay Dyer off without a sale of the Property and could not have done so without Court approval, the letter as much as said that Condren's authority was constrained.

---

**20.** The plaintiff must plead " 'facts that give rise to a strong inference of fraudulent intent.' " See *In re AlphaStar Ins. Group Ltd.,* 383 B.R. 231, 257 (Bankr.S.D.N.Y.2008)(quoting *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); See also *Serova v. Teplen,* 2006 WL 349624, at *8 (S.D.N.Y.2006). "Strong inference of fraudulent intent" requires the pleader to establish facts that either (1) "show that defendant [ ] had both motive and opportunity to commit fraud", or (2) show "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Rule 9(b) requires more than facts that a reasonable person could infer shows a fraudulent intent; rather the "strong" inference required must be cogent. See *Tellabs* at 2510. The court must consider both the inferences put forth by the Plaintiff and any rational competing inferences. *Id.* " 'A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " See *AlphaStar,* 383 B.R. at 257 (quoting *Tellabs* at 2509–10).

Madison has not pleaded any facts that suggest any reason whatsoever why it should have been considered to be a superior bidder under any and all circumstances. When the transaction was in the form of a ground lease as it was at the time of the Debtor's initial discussions with Madison, the Debtor and its partners would have borne credit and other risks over the almost century term of the ground lease then under discussion. However, with an outright sale, the credit risk would evaporate upon closing. There were no doubt tax and other considerations that the Debtor's limited and general partners needed to carefully weigh in deciding whether they preferred a sale or a long-term lease.

This Court has already heard and overruled Madison's objection to the sale to TRM. The Second Circuit has stated that "[t]he rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." See *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr.S.D.N.Y.1989), quoting *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); § 363(b)(1) (requiring court approval for a sale outside the ordinary course of business). The best offer is not solely a function of dollars and includes in its analysis other factors. The City filed an objection to the Debtor's assumption and assignment of its leasehold interest in the Property on a number of legal and factual grounds. Given the paltry option price in

light of the substantial increase in value of the Property in the years since and the unresolved issues of the amounts due on the mortgages, the Debtor had a strong economic incentive to favor a buyer who was satisfactory to the City. One of the issues of importance to the City was the extension of the No. 7 train over a portion of the Property. The City was simply not satisfied with Madison's approach to the No. 7 line extension. Madison and its attorneys must be charged with understanding the factual and legal environment in which its negotiations with Condren occurred since Madison is in the business of investigating, bidding on and negotiating development opportunities. It cannot successfully claim to be a rube taken advantage of by a city slicker.

### The $2.04 Million Claims

■■■■■■ Madison's second claim is in the amount of $2.04 million (the "Expenses Claim"). The over $2 million requested is based on the "actual costs and expenses incurred by Madison Equities in securing, for the benefit of the Debtor, the Madison Equities Enhancement." Request ¶ 159. The same claim is asserted against Condren for failure to negotiate in good faith.[21] The claim against Condren may be summarily dismissed because under New York law a necessary predicate for a failure to negotiate in good faith claim is the existence of an enforceable agreement or an agreement to contract.[22] New York contract law does not recognize a duty of good faith in formation of a contract. See *Frutico S.A. de C.V. v. Bankers Trust Co.,* 833

---

**21.** At no point in the Complaint does Madison allege that the Debtor partnership is insolvent. This is not a mere pleading failure since it is clear that the amount received by the Debtor from the sale of the Property is more than enough to pay all creditors, including Madison if its were allowable. In the absence of insolvency a general partner's joint liability for partnership debts is merely theo-

retical. This alone would be a sufficient reason to grant the motion to dismiss the Complaint against Condren.

**22.** Madison alleges that the Last Look Language shows a binding agreement or a binding preliminary agreement. As analyzed above under the rubric of *Teachers,* this allegation is unfounded.

F.Supp. 288, 300 (S.D.N.Y.1993) ("[W]hen no agreement exists, either in principle or in fact, there is no duty to negotiate in good faith that can be enforced against a party to the negotiations"). A good faith duty only exists in a party's performance or enforcement of a contract. See *In re 50 Pine Co., LLC v. CapitalSource Finance LLC,* 317 B.R. 276, 283 (Bankr.S.D.N.Y. 2004) ("While a covenant of good faith is implied in every contract, the existence of an underlying contractual obligation is presupposed.").

▆ With respect to the Expenses Claim, Madison fairs no better in its attempt to recover this amount from the Debtor because the Expenses Claim lacks a legal underpinning. The Last Look Language was contained in a letter that explicitly stated that Condren was negotiating with others. Madison knew it was not the only bidder on the horizon for the Property. There was no way that Madison could make a bid for the Property without assessing its development prospects in order to determine whether it even wanted to bid and at what price. The Debtor never agreed with Madison to pay or reimburse Madison for any of its expenses in pursuing a deal for the Property. Nor could the Debtor have agreed to do so without court approval since any such contract would not have been in the ordinary course of business. Naming the expenses the "Madison Equities Enhancement" does not convert what was a business expenditure made by Madison into an obligation of the Debtor.

Numerous paragraphs in the Request detail the discussions between the Debtor, Madison and its specialists, such as attorneys and architects, about a proposed development plan for the Property. The worst that can be said is that the Debtor through Condren simply took advantage of Madison's willingness to proceed to incur expenses and to disclose its plans without there being any binding commitment, preliminary or otherwise, or agreement for expense reimbursement. Even though Madison would like this Court to believe that it is unusual, there is nothing unusual about a potential buyer engaging in due diligence and formulating a plan of development when they look to acquire a piece of real estate. Madison appears to be stating that the fact that they made a higher bid for the Property than another bidder in some way shows that they enhanced the value of the Property. However, Madison had no contractual rights to the Property or to the value of any supposed enhancement to the value of the Property that might have come about as a result of its own voluntarily made expenditures and disclosure of its development concepts.

*Conclusion*

For the foregoing reasons, this Court grants the Motion to Dismiss as to both the Debtor and Condren.

The Court is signing separate orders dismissing the Adversary Proceeding and the Request of Payment of Administrative Expenses.